978 A.2d 281 (2009)
409 N.J. Super. 444
CHICAGO TITLE INSURANCE COMPANY, Plaintiff-Respondent,
v.
Daniel ELLIS and MS Financial Services, Inc., Defendants, and
Lehman Brothers Bank, FSB, Plaintiff-Intervenor,
v.
Daniel Ellis, MS Financial Services, Inc., Brenda Rickard, Jamila Davis a/k/a Jamila Baker, Diamond Star Financial Inc., Shaheer Williams, Nick Infantino, United Mortgage Services, Shawn Miller, One Source Mortgage, Carl Dimasi, James Campbell a/k/a Thomas Goldson, Anel Mendez, Brandi Mohammed, Charles Stanton, Brian Togneri, Darnell Barber, Andrew O'Connell, Michael Bassillo, Necker Jean, TDA Appraisers, John Witty, Gordon Lynn, Witty Appraisals, Majadi Hughes, Roberto Franco, The Real Estate Appraisal Depot, Arisma Theodore, Financial Independent Services, Inc., Smart Realty, Debra Friedman, Keith Alliotts, Jamil Ingram, David Solomon, New Life Investments, Inc., Al Rodd, Ahmad Abus Kamal, Mohammed Abu Kamal, Melony Rand, Jamila Davis Realty Inc., Laverne Williams, Leon Williams, Defendants, and
Hosea Davis and Liddie Davis, Defendants-Appellants.
DOCKET NO. A-5133-07T1.
Superior Court of New Jersey, Appellate Division.
Argued April 1, 2009.
Decided July 21, 2009.
*283 Paul Casteleiro, Hoboken, argued the cause for appellants.
Michael R. O'Donnell, Lawrenceville, argued the cause for respondent (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Mr. O'Donnell, of counsel and on the brief; Ronald Z. Ahrens and Jonathan M. Sandler, Morristown, on the brief).
Before Judges STERN, WAUGH and ASHRAFI.
The opinion of the court was delivered by
ASHRAFI, J.S.C. (temporarily assigned).
In this appeal, we consider the tort of conversion as it applies to money rather than chattels. More specifically, we consider whether defendants who received fraudulently obtained money must repay it to the rightful owner even if they had no knowledge of the fraud.
Plaintiff Chicago Title Insurance Company seeks to recoup from defendants portions of more than $22 million dollars defrauded from Lehman Brothers Bank (Lehman). The trial court granted summary judgment to plaintiff on its cause of action for conversion.
Defendants-appellants Hosea and Liddie Davis are the parents of Jamila Davis, one of the perpetrators of the fraud upon Lehman. They admit that they received *284 $512,845 from their daughter in a five-month period and they acknowledge now that she obtained large sums of money through a scheme to defraud Lehman. But, in opposition to summary judgment, defendants asserted they had no knowledge of the fraud, and the money was either repayment of loans they had made to their daughter or Liddie Davis was only a nominal custodian with no dominion or control over most of the money she received.
We hold that exercise of dominion or control over the money constitutes conversion, unless defendants were unaware of the fraud and received the money in exchange for fair value. Each defendant has shown a disputed issue of fact as to value allegedly exchanged for a relatively small portion of the funds received from their daughter. As to the bulk of the funds, the trial court correctly granted summary judgment, concluding that defendants had converted Lehman's property and were liable to repay it. The order of summary judgment is affirmed in part, and reversed in part.

I
In reviewing a grant of summary judgment, an appellate court applies the same standard under Rule 4:46-2(c) that governs the trial court. See Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46, 916 A.2d 440 (2007). The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Here, the facts of the fraudulent scheme are not in dispute. In addition, although plaintiff alleges that Hosea and Liddie Davis must have known that their daughter obtained the money illegally, for purposes of summary judgment, we accept as true defendants' assertion that they did not know.
Beginning in April 2002, Jamila Davis and Brenda Rickard, who were real estate investment consultants, conspired with attorney Daniel Ellis and a number of mortgage brokers and real estate appraisers to obtain millions of dollars through fraudulent mortgage applications. The conspirators would target a multi-million dollar house for sale and recruit a person to act as a sham buyer. They would offer the sham buyer a one-time fee to participate in the scheme, for example, $45,000 or $50,000. The conspirators would then enter into a contract to purchase the house in the sham buyer's name.
Unbeknownst to the innocent sellers, the conspirators would forge the sellers' signatures on a second, false contract at a much higher price for the house, sometimes double the true contract price. For example, one house that sold for $1,500,000 was purported on the false contract to have a price of $3,200,000. Another sold for $2,800,000, but the false contract showed a price of $5,500,000.
A mortgage broker would prepare and submit a false mortgage application in the name of the sham buyer using identification and other information provided by the buyer but adding false income, assets, and other credit information. Appraisers would present false appraisals of the property. Relying on the false documents, Lehman would approve mortgage loans in amounts greater than the actual prices of the houses. For example, on the two houses referenced in the previous paragraph, Lehman lent $2,240,000 on the *285 $1,500,000 house, and $3,575,000 on the $2,800,000 house.
Daniel Ellis would act as the closing attorney, receiving wire transfer of the Lehman mortgage funds. The fraudulently obtained loan proceeds would then be distributed as required to close the sale, with the excess amounts being shared among the conspirators. The sham buyer would not take occupancy or make payments on the Lehman loan, although the conspirators sometimes made installment payments to keep the scheme concealed for some months.
From April to December 2002, Jamila Davis and her co-conspirators completed eight such fraudulent transactions for houses in Bergen County. Lehman lent $22,295,000 in mortgage funds for the eight houses. For her part in the conspiracy, Jamila Davis received more than $2,800,000 of the fraudulently obtained funds. Typically, her ill-gotten gains were first issued to a business entity owned and controlled by her, including Diamond Star Financial, Inc. or Jamila Davis Realty, and then diverted to her personal use.
Eventually, nine persons pleaded guilty pursuant to plea agreements with the federal government. Jamila Davis and Brenda Rickard went to trial and were convicted on seven counts of fraud. Jamila Davis was sentenced to twelve years in federal prison.
At the time the fraud against Lehman began, in April 2002, Jamila Davis and her mother, defendant Liddie Davis, opened a bank account at Citibank in New York City under the name "Liddie M. Davis ITF [in trust for] Jamila Davis." On June 25, 2002, Jamila Davis deposited $98,500 into the account. On August 23, 2002, she issued a check to Liddie Davis for $155,000, which Liddie Davis deposited into the Citibank account. Defendants do not dispute that the source of these deposits was the fraudulently obtained Lehman loan proceeds.
In December 2005, Lehman filed amendments to a complaint in intervention in the Superior Court alleging that Liddie Davis had converted Lehman's funds, including the two large deposits into the Citibank account. In February 2008, plaintiff Chicago Title Insurance Company was subrogated to Lehman's claims after settling with Lehman. At the same time, cross-motions for summary judgment were filed by Chicago Title and defendants.
In the four-page affidavit Liddie Davis filed as part of the summary judgment record, she said that the Citibank account "was administered solely by my daughter, Jamila Davis, in the furtherance of her business interests." She declared further that "my name was on it solely as a means to provide access to it in the event my daughter was unable to access it due to some disability or unavailability."
The Citibank statements show that on July 29 and August 20, 2002, withdrawals totaling $55,419.62 were made from the account. Liddie Davis says in her affidavit that Jamila Davis withdrew the money. It appears from the documents that Jamila Davis took $12,500 of the amount withdrawn in her own name and had bank checks issued for the balance of almost $43,000 to cure a serious delinquency of another mortgage loan in her own name, which was nine payments in arrears and in the hands of an attorney for collection.
Except for one other $55 transaction in October 2002, no further activity occurred on the Citibank account until spring 2003. On April 10 and again on April 14, 2003, Liddie Davis caused a wire transfer on each date of $100,000 out of the Citibank account to Diamond Star Financial, her daughter's company. It was at the same time, in April 2003, that Lehman discovered *286 the fraud because several of the mortgages on the eight Bergen County homes were in default.
In addition to the $253,500 deposited into the Citibank account during the summer of 2002, Liddie Davis received a check from Jamila Davis on June 3, 2002, for $15,000. She says in her affidavit that this amount was "repayment of monies I had loaned my daughter from my retirement account."
Based on these factual assertions, Liddie Davis denies that she converted property of Lehman, declaring that she exercised no dominion or control over the money in the Citibank account and that the $15,000 check was repayment of a loan. The trial court rejected Liddie Davis's defense and granted summary judgment against her in the amount of $268,500 plus interest.
Plaintiff also became subrogated to Lehman's claims for conversion against Hosea Davis. The facts alleged in Hosea Davis's defense date to the summer of 2000, when he says he began lending his daughter money to buy and renovate a home at 186 Covert Street in Brooklyn, New York.
According to his affidavit in the summary judgment record, in early August 2000, Hosea Davis mortgaged a property he owned on Sumpter Street in Brooklyn to lend his daughter the funds to buy the Covert Street home for herself and her children. He has attached to his affidavit unsigned and undated copies of a mortgage and settlement statement for a loan to him from Wells Fargo Bank West in the amount of $133,000 referencing the Sumpter Street property. He says that he added some additional personal funds to the proceeds of the Wells Fargo loan and made a loan to his daughter of $140,910.33. He claims that the loan was secured by a mortgage on the Covert Street property that she executed in his favor on August 30, 2000. He has attached a copy of a mortgage with that date executed by Jamila Davis, but this mortgage was never recorded.
Bank records show that Jamila Davis, or Diamond Star Financial, issued checks as follows to Hosea Davis during the period the fraud against Lehman was active:

 June 4, 2002 $ 20,000
 August 22, 2002 $200,000
 November 15, 2002 $ 24,345
 _________
 Total $244,345

After the fraud was discovered, between May 12 and December 3, 2003, Hosea Davis issued payments to Diamond Star Financial, or otherwise on behalf of Jamila Davis, totaling $187,000.
Hosea Davis declares in his affidavit that besides the mortgage loan of $140,910.33 on the Covert Street property, he lent additional personal funds to his daughter for renovation of that property. He does not have any documents to corroborate these additional loans. He provides a self-prepared accounting by which he alleges that Jamila Davis still owes him $56,963.66.
The trial court concluded that it need not decide whether Hosea Davis's declarations about loans to his daughter are true or not. It determined that there was no disputed issue of fact that Hosea Davis exercised dominion and control over $244,345 received from Jamila Davis, and that Jamila Davis obtained those funds by fraudulent means. The court granted summary judgment against Hosea Davis in that amount plus interest.
In its order, the trial court certified the partial summary judgment against Liddie and Hosea Davis as a final judgment under Rule 4:42-2. Defendants filed a timely notice of appeal.

*287 II
The Restatement (Second) of Torts § 222A(1) (1965) generally defines the common law tort of conversion as follows:
Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.
We discussed conversion recently in LaPlace v. Briere, 404 N.J.Super. 585, 595, 962 A.2d 1139 (App.Div.), certif. denied, 199 N.J. 133, 970 A.2d 1049 (2009):
Conversion has been defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Barco Auto Leasing Corp. v. Holt, 228 N.J.Super. 77, 83, 548 A.2d 1161 (App.Div.1988) (quoting McGlynn v. Schultz, 90 N.J.Super. 505, 526, 218 A.2d 408 (Ch.Div. 1966), certif. denied, 50 N.J. 409, 235 A.2d 901 (1967)). Conversion is an intentional tort in that the defendant must have intended "to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." Prosser and Keeton on Torts § 15 at 92 (5th ed.1984). However, the defendant need not knowingly or intentionally act wrongfully for a conversion to occur. Ibid. Conversion is "the wrongful exercise of dominion and control over property owned by another inconsistent with the owners' [sic] rights." Sun Coast Merch. Corp. v. Myron Corp., 393 N.J.Super. 55, 84, 922 A.2d 782 (App. Div.2007) (quoting Port-O-San Corp. v. Teamsters Local Union No. 863 Welfare & Pension Funds, 363 N.J.Super. 431, 440, 833 A.2d 633 (App.Div.2003)), certif. denied, 194 N.J. 270, 944 A.2d 30 (2008).
The tort of conversion developed historically with respect to chattels, but it has also been applied to money. See, e.g., Hirsch v. Phily, 4 N.J. 408, 416, 73 A.2d 173 (1950); Glenfed Fin. Corp. v. Penick Corp., 276 N.J.Super. 163, 181, 647 A.2d 852 (App.Div.1994), certif. denied, 139 N.J. 442, 655 A.2d 444 (1995). However, courts have restricted its application to money to avoid turning a claim based on breach of contract into a tort claim. See Advanced Enters. Recycling, Inc. v. Bercaw, 376 N.J.Super. 153, 161, 869 A.2d 468 (App.Div.2005).
Defendants contend that their unknowing receipt of Lehman loan proceeds cannot be deemed conversion of Lehman's property. They argue that conversion does not lie in the context of a mere debt and that Lehman did not have title to money that it lent in the belief that it would be used as loans to purchase houses. Defendants cite Advanced Enterprises Recycling for its holding that, "[w]here there is no obligation to return the identical money, but only a relationship of a debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor." Ibid.
Defendants' argument is mistaken because there was no debtor-creditor relationship between Lehman and anyone who possessed the loan proceeds. Hosea and Liddie Davis were never intended to be debtors to Lehman, nor were Jamila Davis and her co-conspirators. The proceeds were lent to a sham buyer who had no intention of accepting the loan and making payments in accordance with a loan agreement. Because the funds were obtained through fraud, neither Jamila Davis nor anyone else ever obtained a right to exercise dominion or control over the money. The money continued to belong to Lehman at all times since there was no true loan transaction, just as money would continue *288 to belong to its owner where it has been stolen by a thief. Therefore, when proceeds from the fraudulent loans were paid over to Liddie and Hosea Davis, those proceeds were still the personal property of Lehman.
Some courts have said that a cause of action for conversion of money does not lie unless the money is identifiable as a specific fund set aside for the owner. See, e.g., Belford Trucking Co. v. Zagar, 243 So.2d 646, 648 (Fla.Dist.Ct.App.1970); Russell v. The Praetorians, 248 Ala. 576, 28 So.2d 786, 789 (Ala.1947). It is essential that the money have belonged to the injured party and that it be identifiable, but the money need not be the identical bills or coins that belong to the owner. See Commercial Ins. Co. of Newark v. Apgar, 111 N.J.Super. 108, 115, 267 A.2d 559 (Law Div.1970); Shahood v. Cavin, 154 Cal.App.2d 745, 316 P.2d 700, 702 (1957).
Where a sum of money is identifiable, courts look to the relative rights of each party to possession and use of the money to determine whether a cause of action lies for conversion. See Key Corporate Capital, Inc. v. Tilley, 216 Fed.Appx. 193, 195-96 (3d Cir.2007) (under Pennsylvania law, sales agent converted proceeds of sale but buyer of equipment was not liable for conversion); Kentuckiana Healthcare, Inc. v. Fourth St. Solutions, LLC, 517 F.3d 446, 447-48 (7th Cir.2008) (under Indiana law, owner of healthcare facility was liable for conversion where it received and kept Medicare and Medicaid reimbursements intended for former manager of facility); Navid v. Uiterwyk Corp., 130 B.R. 594, 595-96 (M.D.Fla.1991) (under Florida law, agent of shipowner converted money belonging to shipper when it received and kept insurance reimbursement for damaged goods).
The crux of conversion is wrongful exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property. McGlynn v. Schultz, 90 N.J.Super. 505, 526, 218 A.2d 408 (Ch.Div. 1966), aff'd, 95 N.J.Super. 412, 231 A.2d 386 (App.Div.), certif. denied, 50 N.J. 409, 235 A.2d 901 (1967); Commercial Ins. Co. of Newark v. Apgar, supra, 111 N.J.Super. at 114-15, 267 A.2d 559; Kentuckiana Healthcare, Inc. v. Fourth St. Solutions, LLC, supra, 517 F.3d at 447. Conversion does not require that defendant have an intent to harm the rightful owner, or know that the money belongs to another. Navid v. Uiterwyk Corp., supra, 130 B.R. at 596. In McGlynn v. Schultz, supra, 90 N.J.Super. at 526, 218 A.2d 408 (quoting 89 C.J.S. Trover and Conversion § 7, pp. 536-37), the court said:
The elements of good faith, intent or negligence do not play a part in an action for damages in conversion....
"While an intent to convert consummated by some positive act, is necessary to constitute conversion, it is very generally held that it is not essential to conversion that the motive or intent with which the act was committed should be wrongful, or willful or corrupt....
* * *
The general rule is that one who exercises unauthorized acts of dominion over the property of another, in exclusion or denial of his rights or inconsistent therewith, is guilty of conversion although he acted in good faith and in ignorance of the rights or title of the owner. The state of his knowledge with respect to the rights of such owner is of no importance, and cannot in any respect affect the case."
Consequently, plaintiff here need not prove that defendants were aware that *289 Jamila Davis had obtained the money through a fraudulent scheme. To prove defendants' liability for conversion, it is sufficient that defendants exercised unauthorized dominion or control over money that belonged to Lehman.
Hosea Davis does not deny that he exercised dominion and control over the money that Jamila Davis transferred to him in 2002. He disputes that Jamila Davis obtained all of that money through her fraudulent scheme.
Diamond Star Financial issued two checks to Hosea Davis during the time of the fraud, on June 4, 2002, for $20,000 and on November 15, 2002, for $24,345. Jamila Davis also caused a bank check to be issued to Hosea Davis for $200,000 on August 22, 2002. In his affidavit, Hosea Davis states that the checks for $20,000 and $24,345 were proceeds of refinancing that Jamila Davis obtained through Washington Mutual Bank, but there is nothing in the summary judgment exhibits from Washington Mutual Bank. He has not presented any document to support his assertion that Jamila Davis had a source other than the fraudulent proceeds for the money that she transferred to him. Nor has he indicated how he has personal knowledge of Washington Mutual refinancing. Hosea Davis's statements are inadmissible hearsay and, therefore, cannot be considered evidence in the summary judgment record showing a disputed issue of fact as to the alleged refinancing and alternative source of funds. See R. 1:6-6; Jeter v. Stevenson, 284 N.J.Super. 229, 233, 664 A.2d 952 (App.Div.1995); Sellers v. Schonfeld, 270 N.J.Super. 424, 427, 637 A.2d 529 (App.Div.1993). Cf. Brill v. Guardian Life Ins. Co. of Am., supra, 142 N.J. at 536, 666 A.2d 146 (the "process" of determining whether summary judgment should be granted is "a kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials").
Defendants do not dispute that Jamila Davis or her business entities received more than $2,800,000 from the Lehman loan proceeds during the relevant time period in 2002. At that time, Jamila Davis was nine payments in arrears on her own mortgage, and she paid more than $43,000 from her ill-gotten funds to cure the deficiency. There is no evidence in the record that she had any other large source of income or assets during the relevant time period. We conclude, therefore, that the summary judgment record contains no evidence creating a genuine issue of disputed fact about the source of the money transferred by Jamila Davis. The money was Lehman's property.
In contrast to Hosea Davis, Liddie Davis does not deny the source of the money but she denies exercising dominion or control over money deposited into the Citibank account. She alleges that the Citibank account belonged to Jamila Davis and Liddie Davis's name was placed on it just in case her daughter was unable to access the account.
As trustee, however, Liddie Davis had full access and signatory rights to the Citibank account. She had the rights of an owner of the account. More important, under New York law, the account was set up as a Totten trust, see Matter of Totten, 179 N.Y. 112, 71 N.E. 748 (1904), which meant that Liddie Davis had the right to withdraw the money for her own use and benefit. Jamila Davis possessed merely an expectancy to the funds on deposit if Liddie Davis were to predecease her without revoking or modifying the trust. See N.Y. Est. Powers & Trusts Law § 7-5.2 (2009). In Geyer v. Kaspar, 244 A.D.2d 148, 672 N.Y.S.2d 428, 429 (1998), the New York court said:

*290 A so-called "Totten" or tentative trust is a revocable savings account trust, in which the named beneficiaries possess a mere expectancy in the trust proceeds prior to the death of the depositor.... Where the beneficiary survives the depositor, the trust terminates and title to the funds vests in the beneficiary.... On the other hand, when the depositor survives the beneficiary, "the trust shall terminate and title to the funds shall continue in the depositor free and clear of the trust."
* * *
[T]he depositor retains title to funds placed in trust for a predeceased beneficiary.
[quoting N.Y. Est. Powers & Trusts Law § 7-5.2(3); other citations omitted].
Under the New York statute, a "depositor" is defined as "a person in whose name a trust account subject to this part is established or maintained." N.Y. Est. Powers & Trusts Law § 7-5.1 (2009). Here, that person was Liddie Davis. The statute says nothing about who actually deposited money into the account or who gave direction regarding disposition of the funds. As the beneficiary, Jamila Davis's interest in the account was "tentative" and "contingent." See Geyer v. Kaspar, supra, 672 N.Y.S.2d at 429. Consequently, Liddie Davis owned the funds in the Citibank account and thus had dominion and control over those funds.
Defendants cite Bauer v. Crummy, 56 N.J. 400, 267 A.2d 16 (1970), for the proposition that the court must look to the intentions of Liddie and Jamila Davis, rather than the legal structure of the account, to determine whether Liddie Davis exercised dominion or control. That case, however, did not involve a Totten trust account but a joint account with the right of survivorship and the respective rights of the persons named on the account after death. The opinion did not discuss whether the joint owners of the account both had dominion or control.
Also, even if New Jersey law rather than New York law were applicable to the Citibank account located in New York and held in the name of a New York resident, Liddie Davis, our conclusion would be the same. The applicable New Jersey statute, N.J.S.A. 17:16I-4(c), states that a trust account belongs to the trustee unless otherwise specified by contract, deposit agreement, or other clear and convincing evidence. Liddie Davis has produced no contract or deposit agreement, and her assertions without other supporting evidence would not satisfy the clear and convincing standard of proof. Therefore, under New Jersey law, too, the Citibank account belonged to Liddie Davis.
In fact, the undisputed evidence shows that Liddie Davis did exercise dominion and control over the account. She made a deposit of $155,000 in August 2002, she ordered withdrawal of $200,000 in April 2003, and she apparently made a $55 transaction in October 2002. Liddie Davis admits in her affidavit that she had the legal authority to withdraw money from the account but says that she did so only at her daughter's direction. That may have been her choice but it does not change the legal consequences of her title to the account and her ability to exercise dominion or control.
We conclude that no genuine issue of fact exists in the summary judgment record with respect to Liddie Davis's dominion and control over the $253,500 of fraudulently obtained loan proceeds deposited into the Citibank account and the additional $15,000 check she received, or with respect to Hosea Davis's dominion and control over $244,345 transferred to him during the relevant time period. We also *291 conclude that no genuine issue of fact exists regarding the source of those funds. They belonged to Lehman as fraudulently obtained loan proceeds. Defendants can avoid liability for conversion only if they can establish other legally cognizable defenses.

III
Despite exercise of dominion or control over money belonging to another, one who innocently received the money in exchange for something of equivalent or comparable value, without participation in or knowledge of the fraud, has a greater right to keep the money than the victim of the fraud has to its return from that person. See Ragsdale v. S. Fulton Mach. Works, 211 B.R. 411, 417 (N.D.Ga.1997); Plitt v. Greenberg, 242 Md. 359, 219 A.2d 237, 241 (1966). For example, if a person who committed fraud or theft has spent the money to buy goods or services, the victim cannot recover the money from the innocent merchant or provider of services.
Similarly, if a prior debt was owed to the innocent recipient of the money, the discharge or reduction of that debt is value given in exchange for the money. See Maplewood Bank & Trust Co. v. F.I.B., Inc., 142 N.J.Super. 480, 485, 362 A.2d 44 (App.Div.1976); Fidelity Trust Co. v. Baker, 60 N.J. Eq. 170, 173, 47 A. 6 (Ch.1900). The wrong done to the victim of the fraud or theft should not be transferred to another innocent party who gave up value without involvement in the wrong and without knowledge of the source of the money.
If, however, the recipient knew that the money belonged to another, the rightful owner may recover the money even if value was exchanged. See Newton v. Porter, 69 N.Y. 133, 135-141 (1877) (attorneys who were knowingly paid their fees with stolen funds were liable to repay it to the rightful owner); Cameron v. People's Bank of Maytown, 297 Pa. 551, 147 A. 657, 659 (1929) (purchaser of stolen certificates of deposit for less than face value could be found liable to rightful owner); Raleigh County Court v. Cottle, 81 W.Va. 469, 94 S.E. 948, 949-50 (W.Va.1918) (sureties that took property as security for bonds knowing that the property had been purchased with embezzled money did not have lien on property superior to rightful owner of money).
Where no value was exchanged, such as where the fraudulently obtained money was given as a gift, then the victim of the fraud has a superior right to return of the money than the recipient has to keep it, even if the recipient had no knowledge of the fraud. See Church of Jesus Christ of Latter-Day Saints v. Jolley, 24 Utah 2d 187, 467 P.2d 984, 985 (1970); Restatement of Restitution § 204 (1937). The recipient of the gift has benefited from an unearned windfall from a wrongdoer who had no right to confer the benefit. The recipient has no greater right to keep money wrongfully obtained than if a pickpocket stole a watch and gave it as a gift to a friend. Returning the gift so that the victim of the wrong is made whole puts the parties back to where they stood before the wrong was done. The recipient has lost nothing that he paid for or earned.
The Restatement of Restitution § 123 (1937), states:
A person who, non-tortiously and without notice that another has the beneficial ownership of it, acquires property which it would have been wrongful for him to acquire with notice of the facts and of which he is not a purchaser for value is, upon discovery of the facts, under a duty to account to the other for the direct product of the subject matter and the value of the use to him, if any.
*292 Thus, the common law recognizes the right of a victim of fraud to recover from an innocent recipient who gave nothing of value in exchange for the money. Furthermore, we have found no precedent or authority justifying an exception for a family gift to one unaware of the fraud. In fact, other jurisdictions that have considered the liability of innocent family members have allowed no such exception.
In Federal Insurance Co. v. Smith, 63 Fed.Appx. 630, 633 (4th Cir.2003), the United States Court of Appeals, applying Virginia law, affirmed a judgment of conversion against a wife who had received funds that her husband had obtained by fraud. The wife made arguments similar to those of defendants here, that a debt could not be the proper subject of a cause of action for conversion, that she had no knowledge of the fraud, and that she did not have dominion or control over the money. The court rejected all the arguments and held the wife liable for conversion of plaintiff's money.
Other courts have relied on a cause of action for unjust enrichment or a constructive trust to require an innocent spouse to return ill-gotten money. See, e.g., In re Marriage of Allen, 724 P.2d 651, 659-60 (Colo.1986); Bank of America Corp. v. Gibbons, 173 Md.App. 261, 918 A.2d 565 (2007); Bransom v. Standard Hardware, 874 S.W.2d 919, 927-28 (Tex.Ct.App.1994).
An exception may apply to the owner's superior right if some other equitable consideration outweighs that right. See Holly v. Missionary Soc. of the Protestant Episcopal Church, 180 U.S. 284, 21 S.Ct. 395, 45 L.Ed. 531 (1901) (rightful owner of money obtained by the fraud of a third person could not recover from charitable institution to which money was given and already expended for charitable uses).
In sum, from this review of the common law we conclude that plaintiff has a valid cause of action for conversion against defendants as allegedly innocent recipients of plaintiff's fraudulently obtained money if defendants gave no fair value in exchange for the money.

IV
Liddie Davis makes no claim that any part of the $253,500 deposited into the Citibank account was exchanged for value given by her. With respect to the separate $15,000 she received on June 3, 2002, Liddie Davis alleges through a single sentence of her affidavit that the money was repayment of a loan she had made to her daughter from her retirement account. Plaintiff Chicago Title contends that we should view her assertion as insufficient because there is no documentary support for the alleged loan and it is merely a "self-serving" declaration.
In Martin v. Rutgers Casualty Insurance Company, 346 N.J.Super. 320, 323, 787 A.2d 948 (App.Div.2002), we said that the plaintiff's self-serving assertion that she was a licensed driver in another state was not sufficient, without documentation or confirmation, to create a genuine issue of fact as to her licensure status. But unlike drivers' licenses, loans are sometimes made and repaid without documentation. Whether self-serving or not, Liddie Davis's sworn statement that there was a loan to her daughter is admissible evidence and sufficient to create a disputed issue of fact about whether she gave fair value for the $15,000 payment, namely discharge of a debt. If plaintiff can show that Liddie Davis's sworn assertion is false, it may seek to recover attorney's fees and other expenses of trial under Rules 4:46-5(b) and 4:46-6.
Hosea Davis claims that the $244,345 transferred to him in 2002 was all repayment of loans he had made to his daughter, *293 many informally and without documentation, mainly for the purpose of purchasing and renovating her Covert Street home. He has provided an accounting to show that Jamila Davis still owes him $56,936.66. A close review of the facts stated in his affidavit and accounting, however, contradicts his declaration that Jamila Davis paid him $244,345 from June through November 2002 in repayment of debts she owed him.
First, Hosea Davis's affidavit is internally contradictory in supporting his claim that money he received from Jamila Davis in 2002 was used to repay the mortgage loan of $140,910.33 he made to her in August 2000. After asserting facts to establish the mortgage loan, the affidavit states, "On or about April 20, 2001, Jamila Davis secured her own financing with Washington Mutual Bank and thereafter Jamila Davis paid to the 186 Covert Street Account the amount of $119,365.00. Thereafter, I paid to Wells Fargo West, from this same account, the sum of $120,000.00. (Defendants' Exhibit L)." Exhibit L attached to the affidavit contains photocopies of two checks, both dated April 23, 2001, both from Hosea Davis payable to Wells Fargo Bank for a total sum of $120,000.
The affidavit and supporting exhibit show, therefore, that Jamila Davis had paid off the mortgage loan from her father for the Covert Street property before she transferred money to him in 2002. The Wells Fargo mortgage that was the source of the loan was paid off by April 23, 2001, about one year before the fraud against Lehman began in April 2002 and more than thirteen months before the first transfer of fraudulently obtained funds from Jamila Davis to Hosea Davis in June 2002. So when fraudulently obtained loan proceeds were paid to Hosea Davis in 2002, Jamila Davis no longer owed Hosea Davis about $140,000 on the mortgage loan for the Covert Street property.
Next, taking as true for purposes of summary judgment the accounting prepared by Hosea Davis, he alleges that he expended $51,806.66 for contractors, appliances, and interest payments to Wells Fargo Bank on behalf of Jamila Davis for the Covert Street home. He also states that he lent Jamila Davis a total of $17,887.00 in April and September 2001. These two amounts add up to $69,693.66, which Hosea Davis allegedly lent to or spent on behalf of Jamila Davis, presumably all before she transferred any of the fraudulently obtained loan proceeds to him.
Thus, even by his own accounting, when $244,345 was transferred to Hosea Davis in 2002, the total amount of his daughter's indebtedness to him was no more than $69,693.66.[1] Hosea Davis has not alleged facts that raise a genuine disputed issue as to whether the entire $244,345 he received from Jamila Davis was in repayment of loans he had made to her. After subtracting $69,693.66 from that amount, the purpose of the remaining $174,651.34 is not supported by factual allegations contained in Hosea Davis's affidavit, or by any other document in the summary judgment record.
Finally, although he did not say so in his own affidavit, Hosea Davis argues in defendants' appellate brief that the $187,000 in payments from him to Diamond Star Financial constitutes additional, new loans *294 that he made to Jamila Davis. Again, defendants have no documents to support that assertion, but the truth of that factual defense is irrelevant. If true, the new loans were made in 2003. They have no bearing on whether payments from Jamila Davis in 2002 were repayments of earlier loans. Even if Hosea Davis made new loans in 2003 totaling $187,000, those loans were not value exchanged for the Lehman's funds given to him in 2002.
Because the accounting provided by Hosea Davis, if true, can support at best a claim that the payments from Jamila Davis included repayment of $69,693.66 that he had lent to her in 2001 or early 2002, a genuine disputed issue of fact has been presented only as to that amount. Hosea Davis has no factual defense based on alleged repayment of loans to him for the balance of the sum he received, $174,651.34.

V
Defendants also argue that they were holders in due course of the checks issued to them by Jamila Davis. Plaintiff urges that we not consider this argument because it was not made to the trial court on the motion for summary judgment. We briefly address the issue to demonstrate that it does not affect our decision.
First, Liddie Davis says in her affidavit that Jamila Davis directly deposited $98,500 into the Citibank account in June 2002. Because Liddie Davis never received a check or any other negotiable instrument for $98,500 according to her own declarations, she would not be a holder in due course of that amount under any circumstances.
With respect to the other amounts defendants received, they were all paid by check. To be a holder in due course of those checks, defendants must have taken the checks for value, in good faith, and without notice of any defect in the checks. See N.J.S.A. 12A:3-302(a)(2). Consequently, the issue again is whether defendants gave fair value for the checks. We have addressed that issue in the previous section.

VI
Summarizing our conclusions, no evidence appears on the summary judgment record to refute the source of money given to defendants as the fraudulently obtained funds of Lehman. The $512,845 Jamila Davis transferred to her parents between June and November 2002 was the property of Lehman. Furthermore, there is no genuine issue of fact regarding the exercise of dominion or control by both defendants over the money received.
Defendants have shown no genuine issue of disputed fact regarding value given by Liddie Davis for $253,500 and by Hosea Davis for $174,651.34. Therefore, partial summary judgment was properly granted against each to the extent of those amounts. Defendants have sworn to facts which, if true, show disputed issues of fact as to whether $15,000 received by Liddie Davis and $69,693.66 received by Hosea Davis were for repayment of loans they had made to Jamila Davis. If true, those amounts would have been paid in exchange for value given, which would be a valid defense to the claim of conversion if defendants had no involvement in or knowledge of the fraud.
The order of the trial court is affirmed in part and reversed in part. This matter is remanded for further proceedings consistent with this decision. We do not retain jurisdiction.
NOTES
[1] The figure $69,693.66 seems overstated because of other inconsistencies in the accounting Hosea Davis has provided, but we view the evidence most favorably to the party opposing summary judgment and only discredit the accounting where the contradiction is obvious on the face of the affidavit and accounting.