**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3519-15T4

MOSHE MEISELS, CHANIE
MEISELS, MONROE ESTATES,
LTD., and PREMIER ESTATES
NY, INC.,

    Plaintiffs-Appellants,

v.

FOX ROTHSCHILD LLP and
ANTHONY ARGIROPOULOS,
ESQUIRE,

    Defendants-Respondents.

_____

Argued July 18, 2017 — Decided June 22, 2018

Before Judges Ostrer and Leone.

On appeal from Superior Court of New Jersey,
Law Division, Mercer County, Docket No.
L-0483-13.

Brian K. Condon argued the cause for
appellants (Condon Catina & Mara, PLLC,
attorneys; Brian K. Condon and Laura M.
Catina, on the briefs).

Francis P. Devine, III, argued the cause for
respondents (Pepper Hamilton LLP, attorneys;
Francis P. Devine and Angelo A. Stio, III, of
counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

We reversed dismissal of plaintiffs' complaint under Rule 4:6-2(e) because the Law Division had not indulgently presumed the truth of plaintiffs' allegations that they had standing to sue. See Meisels v. Fox Rothschild, LLP, No. A-1102-13 (App. Div. Feb. 19, 2015) (Meisels I). Once discovery was completed, defendants obtained dismissal again, this time on a motion for summary judgment. We part company with the trial court's determination that plaintiff Moshe Meisels (Meisels) failed to establish standing to pursue his claims of conversion and breach of fiduciary duty pertaining to $2.4 million deposited in the attorney trust account of defendant Fox Rothschild LLP.[1] We also hold that he presented sufficient evidence to reach a jury on his conversion claim. A formal demand for the return of the funds was not required. However, Meisels, whose identity was undisclosed to defendants, did not establish that defendants entered into a fiduciary relationship with him. Therefore, the court properly dismissed his breach of fiduciary duty claim. We therefore affirm in part, reverse in part, and remand for a trial.

---

[1] For the sake of brevity, we will refer to Moshe Meisels as Meisels, and refer to Chanie Meisels as Chanie, and mean no disrespect in doing so.

I.

We presume the reader's familiarity with our previous opinion. According to plaintiffs' verified complaint, Meisels, a real estate investor residing in London, England, entered into a real estate deal with Eliyahu Weinstein. Each agreed to provide $2.5 million toward the purchase of a property in Irvington, New Jersey. Plaintiffs alleged that at Weinstein's direction, Meisels wired $2,412,163.50 to the attorney trust account of Fox Rothschild, Weinstein's attorneys;[2] and, thereafter, at Weinstein's direction, Fox Rothschild disbursed all the funds for other purposes. These included payments for Weinstein's investments in other properties not involving Meisels, and payment of a fee to Fox Rothschild. Plaintiffs alleged the purchase that Meisels and Weinstein had agreed to make was never consummated. They alleged that Weinstein defrauded them, as he had others. They noted he was ultimately indicted for fraud.[3]

_____

[2] Plaintiffs do not explain the discrepancy between the $2.5 million obligation and the transfer, which we will round to $2.4 million for convenience.

[3] Weinstein eventually pleaded guilty to "operating a Ponzi scheme from 2004-2011 whereby he misappropriated hundreds of millions of dollars that victims thought they were investing in specific real estate transactions." United States v. Weinstein, 658 Fed. Appx. 57, 58 (3d Cir. 2016) (affirming denial of motion to withdraw

3                                                                    A-3519-15T4

Although Meisels, Chanie, Monroe Estates, Ltd., and Premier Estates NY, Inc. asserted various legal theories in support of their claims for relief in the amended complaint that Meisels verified, only Meisels now claims a right to relief, based solely on theories of conversion and breach of fiduciary duty by Fox Rothschild and its then-partner, defendant Anthony Argiropoulos. The reduction of parties and claims was not simply strategic. Rather, it was compelled by facts Meisels presented that contradicted those he initially verified as true.

Since the early stages of this litigation, defendants have contended that any right to relief that may exist — which they also contest — belongs to a London-based corporation called Rightmatch, Ltd. Although the four plaintiffs alleged in their initial verified complaint that "Meisels wired" the $2.4 million, actually Rightmatch ordered the transfer of the $2.4 million into Fox Rothschild's trust account. Rightmatch did so through two wire transfers executed by Cambridge Mercantile Group for $1,328,680.99 and $1,083,482.51. The wire confirmations, attached to plaintiffs' first verified complaint, were addressed to

plea). Plaintiffs, along with other entities, sued Weinstein in a separate lawsuit in Ocean County. See Meisels v. Weinstein, No. A-2734-10 (App. Div. Oct. 21, 2011).

Rightmatch, to Meisels's attention, and confirmed that the payments were made upon Rightmatch's order.

In their amended verified complaint, plaintiffs explained that Rightmatch was simply a conduit and had no interest in the funds. Rather, they alleged that Meisels and Chanie received the funds as a "dividend" from Monroe Estates, a British corporation they owned. Plaintiffs alleged that Monroe Estates lacked an account that could convert currencies; consequently, "they had the money go through . . . Rightmatch, Ltd., so that Rightmatch's account with Cambridge Mercantile Group could be used to convert the funds from British Pound Sterling to Dollars and transferred to the United States." In Meisels I, we held that plaintiffs should be entitled to present proof that they owned the funds.[4]

During the discovery period that followed, plaintiffs disclosed no evidence that the funds came from Monroe Estates. Faced with defendants' motion for summary judgment, Meisels then presented a new explanation for the origin of the $2.4 million. He certified they were "personal funds that I obtained from

---

[4] Plaintiffs' pleading did not explain the basis for a claim by plaintiff Premier Estates NY, which was identified as a New York corporation, principally based in Brooklyn, New York.

mortgages that I took out on different properties that I owned." Meisels identified five London properties.[5]

Meisels contended that documents he produced in discovery established his new claim about the origin of the $2.4 million. He referred to correspondence from his London solicitors Bude Storz; loan offers from a lender, Cheval Bridging Finance; mortgage deeds referring to four of the five properties, which identified Cheval as mortgagee and Meisels as mortgagor; and documents from Barclays, reflecting transfers into the solicitors' account, and out of the solicitors' account to Cambridge Mercantile. We will

---

[5] Meisels's "certification" lacked the essential statement immediately before his signature, per Rule 1:4-4(b): "I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment." See also R. 1:6-6 (requiring that factual assertions in a motion response be supported by affidavits made upon personal knowledge). Defendants did not object on that ground. Cf. Pascack Cmty. Bank v. Universal Funding, LLP, 419 N.J. Super. 279, 288 (App. Div. 2011) (rejecting a "certification" on that ground among others). An objection would have given Meisels an opportunity to seek the trial court's permission to cure the infirmity. We therefore treat the certification as evidential and give it the weight it deserves, which is substantial, mainly because it was supported by documentary proof. Cf. State v. Ingenito, 87 N.J. 204, 224 n.1 (1981) (Schreiber, J., concurring) (noting that hearsay subject to a well-founded objection is evidential absent an objection); N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 348-49 (App. Div. 2016).

address these in greater detail in our discussion of defendants' standing argument.

During oral argument, plaintiffs' counsel conceded that Chanie, Monroe Estates and Premier Estates lacked a basis for relief, since Meisels claimed the funds were his. The trial court agreed with defendants that: Meisels lacked standing because he did not prove ownership; his lack of ownership doomed his conversion claim; the conversion claim also failed because plaintiffs did not demand the return of the funds; and the breach of fiduciary duty claim failed because Meisels had not communicated or made himself known to defendants. The court granted summary judgment, dismissing those two claims. The court also dismissed plaintiffs' other causes of action, which are not the subject of this appeal.

On appeal, Meisels argues he presented sufficient evidence to create a genuine issue of fact regarding his interest in the funds and his standing. He argues that a demand was not essential to his conversion claim, nor was direct communication with Fox Rothschild or its partner essential to his breach of fiduciary duty claim.

## II.

We review the trial court's order de novo, and employ the same standard as the motion judge under Rule 4:46-2(c). Henry v.

N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). The court must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also R. 4:46-2(c). Moreover, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

## A.

We reject the trial court's finding that Meisels lacked standing to sue for the return of the $2.4 million. "Every action may be prosecuted in the name of the real party in interest . . . ." R. 4:26-1. To establish standing, "a party must present a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event of an unfavorable decision." In re Camden Cty., 170 N.J. 439, 449 (2002).

Our courts take a liberal view toward standing. See EnviroFinance Grp., LLC v. Envtl. Barrier Co., 440 N.J. Super.

325, 340 (App. Div. 2015). However, regarding a claim of conversion, "[i]t is essential that the money converted by a tortfeasor must have belonged to the injured party." Advanced Enters. Recycling, Inc. v. Bercaw, 376 N.J. Super. 153, 161 (App. Div. 2005) (quoting Commercial Ins. Co. of Newark v. Apgar, 111 N.J. Super. 108, 115 (Law Div. 1970)).

"Ordinarily, a litigant may not claim standing to assert the rights of a third party." Jersey Shore Med. Ctr.-Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 144 (1980). Also, a third party generally may not assert the claims of a corporation, which is a separate jural entity. See Strasenburgh v. Straubmuller, 146 N.J. 527, 549 (1996) (stating that "[r]egard for the corporate personality demands that suits to redress corporate injuries which secondarily harm all shareholders alike are brought only by the corporation"); cf. Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 437-39 (App. Div. 2011) (recognizing an exception allowing a parent corporation, under the circumstances, to assert claims on behalf of its wholly owned subsidiary).

However, Meisels does not claim to wholly own or control Rightmatch. Rather, he contends that Rightmatch agreed to act as a conduit for the transfer of his personal funds to Fox Rothschild. Granting him the favorable inferences required under our summary judgment standard, we are satisfied he presented sufficient

evidence that Rightmatch agreed to serve as a conduit, and the $2.4 million belonged to Meisels.

As to Rightmatch's agreement, we note that Meisels testified in a deposition that he was Rightmatch's sole director, and Rightmatch was in the real estate investment business and owned property in London. Therefore, he presumably was in a position to have personal knowledge of the agreement, and the authority to approve it.

Regarding Meisels's ownership of the funds, the letter of Meisels's solicitors, Bude Storz, confirmed that Meisels instructed and directed them in making transfers related to the mortgage loans. Meisels also pointed out that his name appeared on the "Payment Reference" line of a Barclays document noting the transfer of £672,249.87 from Bude Storz's account to Cambridge Mercantile. Two similar documents, which referred to payments of £548,404.37 and £800,000 to Cambridge Mercantile from Bude Storz's account, identified Rightmatch on the payment reference line, but Meisels asserted that was an error. Also, the £800,000 payment appears unrelated to the $2.4 million payment. Utilizing published exchange rates in effect at the time, we calculate the £548,404.37 and £672,248.87 were equivalent to $1,084,389.23 and $1,329,273.57 — totaling $2,414,653.45 — close to the total amount transferred by Cambridge Mercantile to Fox Rothschild's account upon

Rightmatch's order.  We presume that the exchange rate actually used in the transaction resulted in the dollar amount that Fox Rothschild actually received.

Meisels presented two apparently separate loan offers from Cheval.  One referred to an offer to lend £733,000 on three properties.  A second offered to lend £590,000 on the remaining two properties.  Two Barclays documents, entitled "Funds Transfer - Credit Advice," confirmed that £684,679.25 and £552,048.75 were received into Bude Storz's account by order of Aubrey David, who apparently was counsel to the lender.  Presumably, the difference between the offered amounts, and the received amounts, is attributable to various fees, charges or pre-payments.  Meisels's name was noted under "Payment Details."  After further reductions, £672,248.87 and £548,404.37 were transferred to Cambridge Mercantile, for currency conversion and transfer to Fox Rothschild upon Rightmatch's order.

We recognize that the proofs are not conclusive.  Although Bude Storz's letter referred to mortgages on the five properties Meisels identified, along with ten others that were completed in three months after the $2.4 million transfer, the solicitors expressed no view of the funds' ownership.  The mention of Meisels on the reference lines does not definitively prove ownership.  Meisels's contradictory explanations also raise questions about

11

his credibility. But, determining issues of credibility is a quintessential jury function. <u>Conrad v. Michelle & John, Inc.</u>, 394 N.J. Super. 1, 13 (App. Div. 2007) (choosing between witness's inconsistent statements is for the jury).

Moreover, on summary judgment, we cannot disregard Meisels's certification to the facts set forth above, explaining that the money belonged to him. Notably, defendants did not argue before the trial court, or before us, that Meisels's certification should be disregarded under the sham affidavit doctrine. <u>Shelcusky v. Garjulio</u>, 172 N.J. 185, 194 (2002).[6]

Defendants also highlight the fact that other persons or entities owned the five properties that Meisels claimed to own, and against which he said he borrowed the $2.4 million. On defendants' behalf, an English solicitor certified, with the support of title documents, that as of the date of the loans, a British corporation, Gilda Estates Ltd., owned three of the

---

[6] A court may not apply the doctrine "mechanistically," but must "evaluate whether a true issue of material fact remains in the case" despite the affiant's prior sworn statement. <u>Id.</u> at 201. Critical to a court's analysis is an affiant's explanation for the contradictory statements. <u>Ibid.</u> (stating a court may not reject the contradictory affidavit "where the contradiction is reasonably explained"). Meisels was not prompted to provide an explanation, since defendants did not invoke the doctrine.

properties, Chanie owned a fourth, and Feige Ernster owned a fifth.[7]

However, Meisels presented deeds listing him as the mortgagor of four of the properties. We note that Meisels testified in a deposition that he was a director of Gilda Estates, as well as Rightmatch. According to the land registry reports, Gilda Estates's London address was the same as Rightmatch's. Whether Meisels was permitted to borrow funds against property formally owned by other entities with which he was involved is an issue between those property owners and Meisels. Likewise, if Meisels lacked authority to use Rightmatch's account to transfer the funds, then it is for Rightmatch to object.[8] Just as Meisels would lack

_____

[7] Although plaintiffs' counsel questioned the accuracy of the certification at summary judgment argument, he made no effort to present contrary documentary evidence, either before argument, in a motion for reconsideration, or before us. By contrast, a letter from Bude Storz to Aubrey David, attached to Meisels's certification, implicitly acknowledged that Gilda Estates owned two properties discussed in the letter, stating, "Our clients confirm . . . Gilda Estates Limited is solvent." The letter also implied that Gilda Estates's compliance with all legal formalities may have been questionable, stating, "The Director is chasing the accountant to file any outstanding returns."

[8] Rightmatch and Gilda Estates were among the plaintiffs in the separate Ocean County lawsuit. Asked if he were a shareholder, Meisels answered, "I think I am," but did not remember his percentage of ownership, or the identity of other shareholders. During discovery, Meisels objected to providing documentation regarding a lawsuit defendants identified as "Rightmatch Ltd v. Meisels [2014] B.P.I.R. 733."

standing to seek the return of the $2.4 million, absent proof he owned it, or was authorized by its owner to seek its return, defendants lack standing to claim that Meisels exceeded his authority when he borrowed the funds, or transferred them through Rightmatch.  See Correia v. Deutsche Bank Nat'l Trust Co., 452 B.R. 319, 324-25 (B.A.P. 1st Cir. 2011) (stating that debtors lacked standing to object that an assignment of their mortgage violated a pooling and servicing agreement because they were neither parties to, nor third-party beneficiaries of, the agreement); Rajamin v. Deutsche Bank Nat'l Trust Co., 757 F.3d 79, 88-90 (2d Cir. 2014) (holding that mortgagors lacked standing to complain of violation of the securitization trust agreement).

We conclude that Meisels presented sufficient evidence of standing to present to a jury his claimed right to seek the return of the $2.4 million.

B.

We turn to Meisels's claim of conversion.  We have adopted the Restatement's definition of conversion, as the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."  Chicago Title Ins. Co. v. Ellis, 409 N.J. Super. 444, 454 (App. Div. 2009) (quoting Restatement (Second) of Torts

14

§222A(1) (Am. Law Inst. 1965)).  "The gist of an action in trover is conversion, that is, the exercise of any act of dominion in denial of another's title to the chattels, or inconsistent with such title."  Mueller v. Tech. Devices Corp., 8 N.J. 201, 207 (1951).

The defendant need not intend to act wrongfully, but must have "intended 'to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'" LaPlace v. Briere, 404 N.J. Super. 585, 595 (App. Div. 2009) (quoting Prosser and Keeton on Torts, §15 at 92 (5th ed. 1984)). A person may be liable for conversion "although he acted in good faith and in ignorance of the rights or title of the owner." McGlynn v. Schultz, 90 N.J. Super. 505, 526 (Ch. Div. 1966) (quoting 89 C.J.S. Trover and Conversion § 1 (1955)), aff'd, 95 N.J. Super. 412 (App. Div. 1967).

Although conversion historically applied to tangible chattels, we held in Chicago Title that the tort may, under certain circumstances, apply to the exercise of dominion or control over money.  Chicago Title, 409 N.J. Super. at 449, 455-56; see also Harper, James and Gray on Torts, § 2.13 at 210 (3d ed. 2006) (noting that conversion "is frequently recognized in connection with funds that have been or should have been segregated for a particular purpose or that have been wrongfully obtained or

retained or diverted in an identifiable transaction").  "It is essential that the money have belonged to the injured party and that it be identifiable, but the money need not be the identical bills or coins that belong to the owner." Chicago Title, 409 N.J. Super. at 455-56.  Addressing a conversion claim against an attorney who allegedly misdirected attorney trust account funds, we stated that "in the bailment context '[t]he tort arises from the bailee's commission of an unauthorized act of dominion over the bailor's property inconsistent with the [bailor's] rights in that property.'" Dynasty Bldg. Corp. v. Ackerman, 376 N.J. Super. 280, 286 (App. Div. 2005) (quoting Lembaga Enters., Inc. v. Cace Trucking & Warehouse, Inc., 320 N.J. Super. 501, 507 (App. Div. 1999)).

On the other hand, a conversion claim does not lie for collection of a mere debt.  Bondi, 423 N.J. Super. at 431.  We held it did not lie where a benefits administrator withdrew funds from volunteer firefighters' accounts, and returned them to the municipality from which it received them, in accord with its contract.  N. Haledon Fire Co. No. 1 v. Borough of N. Haledon, 425 N.J. Super. 615, 631 (App. Div. 2012).  We reasoned the administrator did not exercise independent dominion or control of the funds; the municipality did.  Ibid.; see also Pereira v. United Jersey Bank, 201 B.R. 644, 676 (S.D.N.Y. 1996) (applying New Jersey

law, and finding that a bank subject to a contract with a customer did not exercise dominion and control over funds in the customer's account).

Defendants present two grounds for dismissing Meisels's conversion claim: (1) he failed to prove he owned the $2.4 million and (2) he failed to demand its return. We have already detailed why Meisels presented sufficient evidence on ownership. As for the demand, defendants contend, quoting Mueller, 8 N.J. at 207, that Meisels was required to show that he demanded the return of his property "at a time and place and under such circumstances as defendant is able to comply with if he is so disposed, and the refusal must be wrongful."

Defendants misread Mueller. Demand is not invariably an essential element of conversion. In particular, it is not required when the alleged converter has already parted with the chattel or, in this case, identifiable fund of money. Rather, demand is required where the possessor of the chattels lawfully acquired them, and still retains them. In Mueller, "the chattels were lawfully obtained and in the possession of Technical, and . . . there was no removal of them, [and] no destruction of them . . . ." 8 N.J. at 208.

The Mueller Court stated, "It is well settled that where possession of chattels is lawfully acquired, a demand therefore

and refusal to deliver is generally necessary before an action in trover and conversion will accrue." Id. at 207. Refusal of demand is merely evidence of conversion. Ibid. "'To constitute a conversion of goods there must be some repudiation by the defendant of the owner's right [as by a refusal of a demand], or some exercise of dominion over them by him inconsistent with such right . . . .'" Ibid. (quoting Farrow v. Ocean Cnty. Trust Co., 121 N.J.L. 344, 348 (Sup. Ct. 1938)) (emphasis added); see also Bondi, 423 N.J. Super. at 432 (stating that "[t]he repudiation must be manifested in the injured party's demand for the funds and the tortfeasor's refusal to return the monies sought").

However, where conversion has already occurred by destruction, or wrongful transfer — events not present in Mueller — demand is both futile and unnecessary. "'There must be an actual conversion, or a refusal to deliver on demand, which is evidence of conversion, before the detention becomes unlawful." Mueller, 8 N.J. at 207 (quoting Farrow, 121 N.J.L. at 348) (emphasis added). "The defendant being lawfully in possession of the property, that possession could not become tortious until it has refused upon demand made to deliver them to plaintiff, in the absence of any evidence to show a removal of the goods by the defendant or destruction of them." Temple Co. v. Penn Mut. Life Ins. Co., 69 N.J.L. 36, 37 (Sup. Ct. 1903) (emphasis added).

This limitation on the demand requirement is well-recognized. "If [a] defendant has already incurred liability for converting goods (as by dispossession, by purchase of them, by alteration, etc.) then neither demand nor refusal is necessary to complete the basis for liability . . . ." Harper, James and Gray on Torts, § 2.27 at 245. "A demand is not necessary when there has been a wrongful taking or an exercise of dominion and control over the property inconsistent with the rights of the owner." Stuart Speiser et al., 7 The American Law of Torts, § 24:2 at 1015 (2011).

Connecticut's Appellate Court has succinctly explained when demand is, and is not, required. Demand is only required "where the possession, originally rightful, becomes wrongful by [1] reason thereafter of a wrongful detention," but it is not required in the case of "[2] a wrongful use of the property, or [3] the exercise of an unauthorized dominion over the property." Luciani v. Stop & Shop Cos., 544 A.2d 1238, 1240 (Conn. App. Ct. 1988). The court reasoned that in the latter two cases, "the wrongful use and the unauthorized dominion, constitute the conversion; therefore no demand for the return of the personal property is required." Ibid. (emphasis removed).

In sum, Meisels presented sufficient evidence of ownership to support his claim of conversion, and proof of a demand and refusal was unnecessary under the facts alleged.

19

Meisels also claims that Fox Rothschild owed him a fiduciary duty. However, there was no evidence that Fox Rothschild knew Meisels existed. Fox Rothschild received money from Cambridge Mercantile which referenced Rightmatch, but Meisels's role in or use of Rightmatch and his claimed ownership of the money was not disclosed to Fox Rothschild.

Meisels's undisclosed status undermines his breach of fiduciary duty claim. Meisels admitted that he never communicated with Fox Rothschild or its former partner. He stated he was represented by a different attorney. To prove breach of fiduciary duty, Meisels must first prove a fiduciary relationship existed.

We acknowledge that "a member of the bar owes a fiduciary duty to persons, though not strictly clients, who he knows or should know rely on him in his professional capacity." Albright v. Burns, 206 N.J. Super. 625, 632-33 (App. Div. 1986); see also Banco Popular No. America v. Gandi, 184 N.J. 161, 183-86 (2005) (attorney prepared a false opinion letter to a lender, regarding his client's financial status, to assist his client in obtaining a loan); Petrillo v. Bachenberg, 139 N.J. 472, 479-80, 487-88 (1995) (real estate attorney provided incomplete percolation reports to a potential buyer, which the potential buyer reasonably relied upon). "[A]n express agreement — such as an escrow

arrangement — can serve as the source of an attorney's duty to a third party."  Kevin H. Michels, <u>N.J. Attorney Ethics</u>, §§ 46:2 at 1212, 46:2-2(b) at 1222 (2018).

Yet, Meisels presented no evidence that Fox Rothschild entered into an express or implied agreement with him. Furthermore, based on his undisclosed status, there is no evidence that the firm or its former partner knew, or had reason to know, that he allegedly relied on them in their professional capacity. In <u>Dynasty Bldg.</u>, 376 N.J. Super. at 283, upon which Meisels relies, the plaintiffs had deposited funds into the defendant's attorney trust account.  They claimed the attorney breached his fiduciary duty by misdirecting the funds.  We held, "If in fact the plaintiffs can establish that it was their funds, a fiduciary relationship developed between them and [the attorney] even though he did not represent them in any matter."  <u>Id.</u> at 287.  However, in that case, the plaintiffs asserted their claim to the funds before the attorney disbursed them, and the attorney acted based on his client's competing claim.  That, he was not free to do. <u>Ibid.</u>

Likewise, Meisels misplaces reliance on <u>In re Hollendonner</u>, 102 N.J. 21 (1985), and <u>In re Frost</u>, 171 N.J. 308 (2002).  The Court in those cases found a fiduciary relationship, but the attorney in <u>Frost</u> communicated with or knew the party claiming

breach, Frost, 171 N.J. at 316-17; and there was an express escrow agreement involving the party in Hollendonner, 102 N.J. at 22.

Fox Rothschild may have been aware, based on the wire confirmation, that it was entrusted with funds from Rightmatch.[9] However, we are not asked to determine whether Rightmatch has a viable breach of fiduciary duty claim. As for Meisels, we conclude that his undisclosed status dooms his claim.

D.

In sum, we conclude Meisels has presented sufficient evidence to reach a jury on his ownership of the $2.4 million and his standing to seek its return. He also has presented sufficient evidence to support his conversion claim. He was not required to demand the return of the $2.4 million after defendants allegedly disbursed it at Weinstein's direction. Finally, the court correctly granted summary judgment dismissal of the breach of fiduciary duty claim.

Affirmed in part; reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[9] We acknowledge the equitable principle that "once moneys have been received or allocated for a certain purpose such moneys become impressed with a definite trust to be disbursed for that purpose only." Nat'l Surety Corp. v. Barth, 11 N.J. 506, 514 (1953). However, there is no evidence that Rightmatch communicated to Fox Rothschild the purpose for which the funds were to be used.

A-3519-15T4