OPINION OF THE COURT
 

 BARRY, Circuit Judge.
 

 This case arises out of the competing claims of Wawel Savings Bank (“Wawel”) and Yale Factors LLC (“Yale”) to the accounts receivable of debtor Jersey Tractor Trailer Training, Inc. (“JTTT”). Waw-el entered into a loan agreement with JTTT and its president, William B. Oliver, for the principal amount of $315,000. In the corresponding security agreement, JTTT pledged all capital equipment and assets of the company as collateral, and Wawel perfected its security interest by
 
 *149
 
 filing Uniform Commercial Code Financing Statements (“UCC-ls”) with the New Jersey Department of the Treasury and the Bergen County Clerk’s Office. Approximately one year later, JTTT entered into a factoring agreement with Yale whereby JTTT agreed to sell the rights to its accounts receivable in return for, inter alia, a 61.5 percent up-front payment of the amount due on the particular account receivable. Yale subsequently filed a UCC-1 statement describing its lien on all present and after-acquired accounts receivable of JTTT.
 

 On April 4, 2006, JTTT filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code,
 
 see
 
 11 U.S.C. § 1101,
 
 et seq.,
 
 and on June 29, 2006, Wawel brought this action seeking declaratory relief that its lien on JTTT’s accounts receivable had priority over Yale’s lien; that it was entitled to the proceeds of JTTT’s accounts receivable that had been held in escrow following a state action filed by Yale; and that it was entitled to JTTT’s outstanding accounts receivable until its lien was satisfied.
 
 [1]
 
 Because the parties did not dispute that Wawel had a “first in time” lien against JTTT’s accounts receivable — and thus a senior security interest — the central issue was whether Yale could establish that it maintained a priority position as a matter of law.
 
 See
 
 N.J.S.A § 12A:9-322(a)(l); U.C.C. § 9 — 322(a)(1) (“Except as otherwise provided ... [cjonflicting perfected security interests ... rank according to priority in time of filing or perfection.”).
 
 [2]
 
 More specifically, unless Yale could establish (a) that Wawel consented to the sale of JTTT’s accounts receivable free of its security interest,
 
 see
 
 U.C.C. § 9 — 315(a)(1), or (b) that it was a holder in due course of JTTT’s accounts receivable,
 
 see id.
 
 at 9-3 31(a), or (c) that it was a purchaser of instruments, see
 
 id.
 
 at 9-330(d), then Wawel was entitled to the relief it sought.
 

 Following a two-day bench trial, the Bankruptcy Court found in favor of Waw-el, stating that it was “entitled ... to a judgment granting it ... all [accounts] receivable proceeds presently held in escrow, as well as the proceeds of all outstanding accounts receivable.” (App. at 97.) The Bankruptcy Court found, as a matter of fact, that Wawel did not authorize JTTT’s factoring agreement with Yale, and held that Yale could not be considered a purchaser of instruments or a holder in due course because it did not establish that it acted in good faith by observing reasonable commercial standards of fair dealing. Yale conducted lien searches for “Jersey Tractor Trailer Training,” omitting “Inc.” from JTTT’s full corporate name; those searches, the Bankruptcy Court determined, were substandard. Yale appealed to the District Court pursuant to 28 U.S.C. § 158(a), and the District Court affirmed.
 

 We will affirm in part because the Bankruptcy Court properly concluded that Wawel had not authorized the sale of JTTT’s accounts receivable free of its security interest. The Bankruptcy Court’s analysis of whether Yale should be considered a purchaser of instruments or a holder in due course, however, is undermined by its legal conclusion that a lien search is commercially unreasonable if it does not include the debtor’s full corporate name. We will, therefore, vacate the judgment of
 
 *150
 
 the District Court affirming the order of the Bankruptcy Court, and remand to the District Court with the direction that the case be remanded to the Bankruptcy Court to determine whether Yale qualifies as a holder in due course or as a purchaser of instruments.
 

 I. Background
 

 A. Facts
 

 JTTT is a closely-held New Jersey corporation that specializes in training truck drivers to pass the uniform Commercial Driver’s License (“CDL”) exam. In January 2002, JTTT’s owner and president, William B. Oliver, applied to Wawel, seeking a loan in the amount of $315,000. JTTT’s application was granted and, on March 7, 2002, JTTT and Wawel entered into a loan agreement. The corresponding security agreement pledged all of JTTT’s assets, including its accounts receivable, as collateral for the loan.
 
 [3]
 
 The agreement further stated that “[i]f this agreement includes accounts, I[, Oliver,] will not settle any account for less than its full value without your written permission [and] I will collect all accounts until you tell me otherwise.” (App. at 837.)
 

 At the time, the JTTT loan was the largest commercial loan made by Wawel, and bank president Robert Ranzinger, Sr., was personally responsible for its administration. In an effort to keep an eye on JTTT’s finances, Ranzinger asked Oliver to move JTTT’s business bank accounts to Wawel, and Oliver agreed to do so. As Ranzinger testified, the security agreement allowed JTTT to sell its assets, including its accounts receivable, unless it was in default. It did not, however, allow JTTT to sell its accounts receivable for less than their full value.
 

 Nevertheless, under Oliver’s direction, JTTT did just that. On March 12, 2003, Oliver applied to enter into a factoring agreement with Yale. Before granting Oliver’s application, Harry Perkal, Yale’s president, engaged in a limited review of JTTT’s finances.
 
 [4]
 
 Perkal testified that he asked Dun & Bradstreet to perform a lien search on JTTT’s property, and that the search was conducted on “Jersey Tractor Trailer Training,” although Perkal knew JTTT’s full name to be “Jersey Tractor Trailer Training, Inc.” He also testified that Dun & Bradstreet performed monthly lien searches thereafter. The earliest such search included in the record is dated May 8, 2003. That search, despite not including “Inc.” in the search term, revealed a terminated lien against “Jersey Tractor Trailer Training, Inc.,” but did not reveal Waw-el’s outstanding lien.
 

 Yale and JTTT entered into the factoring agreement on March 20, 2003. The agreement provided that, upon receiving commitments to pay from its clients, JTTT would assign those commitments to Yale in exchange for 70 percent of their face value less an 8.5 percent fee — a net 61.5 percent.
 
 [5]
 
 JTTT represented on each assign
 
 *151
 
 ment that it was the “sole owner” of each account receivable “free and clear of all liens, claims, security interests and encumbrances except in [Yale’s] favor.” (Dist. Ct. Docket No. 7-3 at 28.) When Yale received the payment from JTTT’s clients, it would rebate the remaining 30 percent to JTTT.
 
 [6]
 

 At the outset of the factoring agreement, Yale wired its payments into JTTT’s bank account at the Bank of New York, and Oliver withdrew the money and transferred it to JTTT’s account at Wawel. Oliver and Perkal agreed, however, that the process took too long, and soon Perkal sought to wire money directly to JTTT’s account at Wawel. Because Wawel was a savings and loan bank, it did not have access to the Federal funds system and was not able to directly receive wire transfers. Instead, Wawel maintained an account at the Federal Home Loan Bank of New York (“FHLB”) to allow its customers access to wire transfers. Beginning in November 2003, Yale purchased JTTT’s accounts receivable by wiring money to Wawel’s account at the FHLB.
 
 [7]
 

 By December 2005, JTTT’s business checking account had a negligible balance and the company had missed several loan payments. Ranzinger met with Oliver on December 9, 2005 to discuss the matter. It was at that time, according to Ranzinger, that Oliver first notified him of JTTT’s factoring agreement with Yale. Ranzinger testified that any prior notice of factoring would have set off “bells and whistles and red lights.” (App. at 156.) Oliver agreed, testifying that he purposefully concealed the factoring agreement from Wawel because “if they knew about it[,] I’d be in big trouble with the bank.”
 
 (Id.
 
 at 405.) Following the meeting, Oliver faxed the factoring agreement to Ranzinger, who reviewed it and demanded a meeting with Yale. That meeting, with Perkal, Ranzinger, Oliver and JTTT’s accountant in attendance, occurred on December 20, 2005. At the meeting, Perkal and Ranzinger discussed the details of the factoring agreement, including the amount JTTT owed Yale, which was approximately $600,000 in overdue accounts receivable. Ranzinger testified that he told Perkal about the Wawel loan, and about Wawel’s security interest in JTTT’s accounts receivable. Within days after the meeting, Ranzinger notified Oliver that the factoring agreement was in violation of the Wawel loan terms. In January 2006, Oliver sought to end the factoring agreement, informing Yale that JTTT would not renew the agreement when it expired on March 20, 2006.
 

 In March 2006, Perkal reviewed the records of the earlier lien searches, and dis
 
 *152
 
 covered that the search term omitted “Inc.” from JTTT’s full corporate name. He then asked a Yale employee to conduct a lien search using the full name and that search revealed Wawel’s lien (including the fact that it was filed one year before Yale’s).
 
 [8]
 

 B. Procedural History
 

 Wawel filed this action against Yale and JTTT, and the Bankruptcy Court held a two-day bench trial. The Bankruptcy Court rejected Yale’s argument that Waw-el had consented to JTTT’s sale of its accounts receivable, and instead found that Ranzinger
 
 and
 
 the bank itself “had no actual notice” of the factoring agreement until “the December 9, 2005 meeting between Mr. Ranzinger and Mr. Oliver.”
 
 (Id.
 
 at 88).
 
 [9]
 
 Because the Bankruptcy Court concluded that Wawel did not have knowledge of JTTT’s sale of its accounts receivable, it held that Wawel could not have “authorized the disposition” of JTTT’s accounts receivable “free of [its] security interest.”
 
 See
 
 U.C.C. § 9-315(a)(1).
 

 The Bankruptcy Court also concluded that Yale could neither be considered a holder in due course nor a purchaser of instruments.
 
 See
 
 U.C.C. § 9-331(a) (Article 9 “does not limit the rights of a holder in due course of a negotiable instrument ... [which] take[s] priority over an earlier security interest, even if perfected .... ”);
 
 id.
 
 § 9 — 330(d) (stating that a “purchaser of an instrument has priority over a security interest in the instrument perfected by a method other than possession if the purchaser gives value and takes possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured party”). In this context, as the Bankruptcy Court recognized, the questions of whether Yale is a holder in due course and whether it is purchaser of instruments overlap significantly.
 

 The Bankruptcy Court first accepted, for purposes of its analysis, that the invoices associated with JTTT’s accounts receivable qualified the accounts receivable as “instruments.”
 
 See
 
 U.C.C. §§ 9-102(b) and 3-302(a) (“ ‘holder in due course’ means the holder of an
 
 instrument
 
 ... ”) (emphasis added);
 
 id.
 
 at § 9-330(d) (“purchaser of an
 
 instrument
 
 ”) (emphasis added).
 
 [10]
 
 Because it is clear that Yale bought the accounts receivable for value, the Bankruptcy Court focused on whether Yale had purchased them in “good faith.”
 
 See
 
 U.C.C. § 3-302(a) (A person may only be considered a holder in due course where he has “tfaken] the instrument for value, in good faith, [and] without notice” of various defects or claims.);
 
 id.
 
 at § 9-330(d) (“[A] purchaser of an instrument [is
 
 *153
 
 one who] gives value and takes possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured party.”);
 
 id.
 
 at §§ 3-103(a)(4) and 9-102(a)(43) (‘“Good faith’ means honesty in fact and the observance of reasonable commercial standards of fair dealing.”).
 
 [11]
 
 The Bankruptcy Court concluded, without discussion, that “Yale failed to observe reasonable commercial standards of fair dealing ... when it conducted its series of UCC searches on ... the incorrect corporate name.” (App. at 94.) Additionally, it concluded that “a search of JTTT revealing no significant secured bank debt, at a time when the company faced liquidity issues necessitating the use of a factor, should have raised red flags,” and Yale acted in bad faith by ignoring those flags.
 
 (Id.)
 

 Consequently, the Bankruptcy Court found that Wawel was entitled to “all [accounts] receivable proceeds presently held in escrow, as well as the proceeds of all outstanding accounts receivable.”
 
 (Id.
 
 at 97.) The District Court affirmed.
 
 [12]
 

 II. Jurisdiction & Standard of Review
 

 We have jurisdiction pursuant to 28 U.S.C. § 158(d). “In reviewing an appeal to a District Court of a bankruptcy decision, we stand in the shoes of the District Court and review the Bankruptcy Court’s decision.”
 
 In re Sterten,
 
 546 F.3d 278, 282 (3d Cir.2008) (quotation marks and citation omitted). Accordingly, “we review the Bankruptcy Court’s findings of fact for clear error and its legal conclusions
 
 de novo.” In re Pransky,
 
 318 F.3d 536, 542 (3d Cir.2003).
 

 III. Discussion
 

 Generally, “[Conflicting perfected security interests ... rank according to priority in time of filing or perfection.” U.C.C. § 9-322(a)(l). There are, however, exceptions — three of which Yale argues apply here. First, a senior secured creditor may waive its security interest,
 
 see id.
 
 at § 9-315(a)(1), and Yale asserts that Wawel did precisely that. Alternatively, Yale asserts that it should be considered a holder in due course,
 
 see id.
 
 at § 9-331(a), or a purchaser of instruments,
 
 see id.
 
 at § 9-330(d), and should therefore have priority over Wawel’s senior security interest. We will address each assertion in turn.
 
 [13]
 

 A. Consent to Sale & U.C.C. § 9-315(a)(l)
 

 Yale’s argument that Wawel waived its security interest in JTTT’s accounts receivable relies on U.C.C. § 9-315(a)(l), which states that “a security interest ... continues in collateral notwithstanding sale ... or other disposition thereof
 
 unless the secured party authorized the disposition free of the security interest
 
 .... ” (Emphasis added). The general rule, as the commentary notes, is “that a security interest survives the disposition of the collateral,” and Yale must establish that JTTT’s sale
 
 *154
 
 of its accounts receivable fits within the exception for “authorized disposition ‘free of the security interest.”
 
 Id.
 
 at cmt. 2. The question we must answer is whether the Bankruptcy Court clearly erred in concluding that it did not do so.
 
 [14]
 

 Yale argues, first, that because the security agreement accompanying Wawel’s loan to JTTT did not expressly prohibit the sale of collateral, Wawel waived its security interest. That argument is without merit, especially given that in its agreement with Wawel, JTTT represented that it “w[ould] not settle any account for less than its full value without your written permission,” and that it would “collect all accounts until [told] otherwise.” (App. at 837.) JTTT’s sale of its accounts receivable, therefore, ran afoul of the security agreement.
 

 Alternatively, Yale argues that Wawel, in its course of dealing, implicitly waived its security interest. That argument has two components: first, that the Bankruptcy Court clearly erred in finding that Wawel lacked knowledge of the factoring agreement until December 9, 2005; and, second, that Wawel approved of the agreement to the extent that it surrendered its security interest in JTTT’s accounts receivable. We are receptive to Yale’s position regarding knowledge. At least one of four officers at Wawel- — each of whom, according to Ranzinger’s testimony, had the authority to bind the bank — received notification (via phone, facsimile, or mail) of each of the 199 wire transfers from “Yale Factors NJ LLC” to JTTT.
 
 Cf NCP Litig. Trust v. KPMG LLC,
 
 187 N.J. 353, 901 A.2d 871, 879 (N.J.2006) (“The imputation doctrine is derived from common law rules of agency ... [and pjursuant to those common law rules, a principal is deemed to know facts that are known to its agent”). We assume, therefore, for purposes of our analysis (and contrary to the Bankruptcy Court’s factual determination), that Wawel was aware that JTTT was involved with a factor — and thus was selling its accounts receivable.
 

 Even assuming that knowledge, however, there is a substantial difference between Wawel knowing of the sale of JTTT’s accounts receivable, and Wawel authorizing the sale “free of its security interest.”
 
 See
 
 U.C.C. § 9-315(a)(l). Yale argues to the contrary, but relies exclusively on cases interpreting former U.C.C. § 9-306(2), which was replaced by revised U.C.C. § 9-315(a)(l) in New Jersey, effective July 1, 2001.
 
 See
 
 U.C.C. § 9-315 cmt. 2 (stating that “Subsection (a)(1) ... derives from former Section 9-306(2)”). The two sections differ in one material respect. Former § 9-306(2) stated that “a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof,
 
 unless the disposition was authorized
 
 by the secured party in the security agreement or otherwise ...” (emphasis added), while revised § 9-315(a)(l) states: “a security interest ... continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof
 
 unless the secured party authorized the disposition free of the security interest .... ”
 
 (emphasis added).
 
 [15]
 

 
 *155
 
 Consistent with revised U.C.C. § 9-315(a)(l), we must determine whether there is any evidence to support Yale’s contention that Wawel impliedly authorized the sale of JTTT’s accounts receivable free and clear of its security interest. In so doing, we keep in mind that the theory underlying U.C.C. § 9 — 315(a)(1) “is that a security interest would be meaningless if the secured party could not reach the collateral in the hands of a third party ... when the debtor disposes of it without authorization.” William D. Hawkland, Frederick H. Miller & Neil B. Cohen, 9B
 
 Hawkland U.C.C. Series
 
 § 9-315:l[Rev] (2008). Because § 9 — 315(a)(1) does not require a secured party to take action to preserve its security interest, inaction alone may not lead to a finding of implied authorization. Inaction, however, is all Yale can demonstrate — specifically that Wawel failed to stop the ongoing sales of JTTT’s accounts receivable. Acts of “[(Implied authorization ... must unequivocally demonstrate an intent to waive the security interest,” Lary Lawrence, 11
 
 Anderson U.C.C.
 
 § 9-315:9[Rev] at 439 (2007), and evidence of such unequivocal intent is absent here.
 

 B. Holder in Due Course & Purchaser of Instruments
 

 Regardless of whether Wawel waived its security interest, Yale has priority over that interest if it is either a holder in due course or a purchaser of instruments. “A holder in due course is one who takes an instrument for value, in good faith, and without notice of dishonor or any defense against or claim to it on the part of any person.”
 
 Triffin v. Pomerantz Staffing Servs., LLC,
 
 370 N.J.Super. 301, 851 A.2d 100, 103 (2004) (quotation marks and citation omitted);
 
 see
 
 U.C.C. §§ 9-102(b) and 3-302(a) (defining holder in due course). If those requirements are met, a holder in due course “take[s] priority over an earlier security interest, even if perfect
 
 *156
 
 ed.... ” U.C.C. § 9-331(a). The same is true for a purchaser of instruments.
 
 See id.
 
 at § 9-330(d) (“purchaser of an instrument has priority over a security interest in the instrument perfected by a method other than possession ... ”). To be considered a purchaser of instruments, Yale must have “give[n] value and take[n] possession of the instrument in good faith and without knowledge that the purchase violates the rights of the secured party.”
 
 Id.
 
 at § 9 — 330(d).
 
 [16]
 

 Because it is clear that Yale took the accounts receivable for value and that they did not bear markings of forgery or illegitimacy, and because the Bankruptcy Court did not reach the notice-related requirements in U.C.C. §§ 3-302 and 9 — 330(d), our inquiry has one central component— did Yale act in good faith? “Good faith” is defined in the U.C.C. as “honesty in fact and the observance of reasonable commercial standards of fair dealing.” U.C.C. §§ 3-103(a)(4); 9-102(a)(43);
 
 see id.
 
 at § 9-331 cmt. 5 (“In order to qualify as a holder in due course, the junior [secured creditor] ... not only must act ‘honestly’ but also must observe ‘reasonable commercial standards of fair dealing’ under the particular circumstances”;
 
 id.
 
 at § 9-330 cmt. 7 “[T]he same good faith requirement applicable to holders in due course” applies to purchasers of instruments). This definition has both a subjective prong — “honesty in fact” — and an objective prong — observance of “reasonable commercial standards of fair dealing.”
 
 See Triffin,
 
 851 A.2d at 104 (“a holder in due course must satisfy both a subjective and objective test of good faith”). The Bankruptcy Court found, and the parties do not dispute, that Yale satisfied the subjective requirement of the good faith definition. At issue in this appeal is the Bankruptcy Court’s determination with regard to Yale’s objective good faith — whether it observed “reasonable commercial standards of fair dealing,”
 
 see
 
 U.C.C. § 9-330 cmt. 7 — and that “determination ... [is] reviewed
 
 de novo." In re Joe Morgan, Inc.,
 
 985 F.2d 1554, 1558 (11th Cir.1993) (citations omitted).
 

 Yale’s primary argument is that it did, in fact, act in good faith by following reasonable commercial standards of fair dealing. As the commentary provides, “ ‘good faith’ does not impose a general duty of inquiry, e.g., a search of the records in filing offices,” but “there may be circumstances in which ‘reasonable commercial standards of fair dealing’ would require such a search.” U.C.C. § 9-331 cmt. 5. Neither party disputes that a search was required under the circumstances here.
 
 See id.
 
 (“Consider, for example, a junior secured party in the business of ... buying accounts who fails to undertake a search to determine the existence of prior security interests. Because such a search ... would enable it to know or learn upon reasonable inquiry that collecting the accounts violated the rights of a senior secured party, the junior may fail to meet the good faith standard”). Instead, the issue is whether the lien searches conducted by Dun
 
 &
 
 Bradstreet on Yale’s behalf comported with reasonable commercial standards of fair dealing. “[F]air dealing is a broad term that must be defined in context, [but] it is clear that it is concerned with the
 
 fairness of conduct
 
 
 *157
 
 rather than the
 
 care
 
 with which an act is performed.” U.C.C. § 3-103 cmt. 4 (emphasis added).
 
 [17]
 
 It is likewise clear that “fair dealing ... [is] to be judged in the light of reasonable commercial standards ....”
 
 Id.
 
 Our inquiry, therefore, contains two steps: “[F]irst whether the conduct of the holder [of the instruments] comported with industry or ‘commercial’ standards applicable to the transactions and, second, whether those standards were reasonable standards intended to result in fair dealing.”
 
 Maine Family Fed’l Credit v. Sun Life Assurance Co. of Canada,
 
 727 A.2d 335, 343 (Me.1999).
 

 We begin with whether the Dun & Bradstreet lien searches comported with industry standards. We note, initially, that the lien searches — using the search term “Jersey Tractor Trailer Training” and omitting “Inc.,” — revealed a terminated lien on the accounts receivable of “Jersey Tractor Trailer Training,
 
 Inc.”
 
 (App. at 764) (emphasis added).
 
 [18]
 
 Like the Bankruptcy Court, we are “at a loss to understand how and/or why the ... searches] failed to disclose Wawel’s filing,”
 
 (id.
 
 at 94), but it does not follow that the searches were commercially substandard. As the search records demonstrate, the Dun & Bradstreet searches were tailored to discover liens against “Jersey Tractor Trailer Training”
 
 and
 
 “Jersey Tractor Trailer Training, Inc.” That they did not reveal Wawel’s lien is anomalous — and not evidence of commercial unreasonableness.
 

 The Bankruptcy Court’s determination to the contrary was shaped by its reliance on
 
 In re Thriftway Auto Supply, Inc.,
 
 159 B.R. 948 (W.D.Okla.1993),
 
 aff'd
 
 39 F.3d 1193 (10th Cir.1994). The
 
 Thriftway
 
 court addressed what constituted a “ ‘reasonably diligent’ search” in a different context— namely whether a UCC-1 filing statement filed under the wrong name still served to perfect the creditor’s security interest because it would have been discovered by a reasonably diligent searcher.
 
 See
 
 159 B.R.
 
 *158
 
 at 951. The court held that “a searcher should be required to at least take advantage of the flexibility offered by a computer system to find all potential filings with similar names,”
 
 id.
 
 at 953, by using “minimal creativity” to search common variants of the debtor’s corporate name.
 
 Id.
 
 at 954.
 
 But see In re Summit Staffing Polk County, Inc.,
 
 305 B.R. 347, 354 n. 7 (Bankr.M.D.Fla.2003) (collecting cases interpreting former Article 9 as requiring a more limited search). The Bankruptcy Court’s reliance on
 
 Thriftway
 
 was error, because “[r]evised Article 9 rejects the duty of a searcher to search using any names other than the name of the debtor....”
 
 Summit Staffing,
 
 305 B.R. at 354-55. Indeed, revised U.C.C. § 9 — 506(c) narrows the responsibility of a reasonable searcher, providing that a misfiled financing statement will be considered seriously misleading unless “a search of the records of the filing office under the debtor’s correct name, using the filing office’s standard search logic, if any, would disclose [the misfiled] financing statement....”
 

 Using revised U.C.C. § 9-506(c) as a guide, we hold that a commercially reasonable lien search is a “search of the records of the [relevant state or county] filing office, under the debtor’s correct name,
 
 using the filing office’s standard search logic
 
 .... ” (emphasis added). It appears that the Dun
 
 &
 
 Bradstreet searches met that standard. See Int’l Ass’n of Commercial Adm.,
 
 Uniform Commercial Code, Article 9, Model Administrative Rules,
 
 Rule 503.1.5 (2007) (in conducting searches “words and abbreviations at the end of an organization name that indicate the existence or nature of the organization” including “Inc[.],” “are ‘disregarded’ to the extent practicable”).
 
 [19]
 
 We nevertheless leave that determination to the Bankruptcy Court in the first instance.
 

 In this narrow context, the second element of the reasonable commercial standards of fair dealing inquiry- — specifically “whether [the industry] standards were reasonable standards intended to result in fair dealing,”
 
 Maine Family,
 
 727 A.2d at 343 — yields a clear answer.
 
 See
 
 U.C.C. § 3-103 cmt. 4 (“fair dealing is a broad term that must be defined in context”). A lien search that complies with the standard set forth in U.C.C. § 9-506(c) necessarily reflects “fairness of conduct,”
 
 see id.
 
 at § 3-103 cmt. 4, tailored to reveal senior security interests. Thus, if the lien searches conducted on Yale’s behalf used the “standard search logic,” U.C.C. § 9-506(c) — a question left to the Bankruptcy Court on remand — they were in keeping with reasonable commercial standards of fair dealing. Whether the searches, if properly conducted, and Yale’s other pre-factoring-agreement investigation of JTTT’s business, were sufficient to meet Yale’s duty to deal fairly in purchasing JTT’s accounts receivable is likewise left to the Bankruptcy Court on remand.
 
 See id.
 
 at § 9-331 cmt. 5 (Whether the junior secured party acts in good faith is “fact-sensitive and should be decided on a case-by-case basis”).
 
 [20]
 

 The Bankruptcy Court added that “a search of JTTT revealing no significant bank debt[ ] at a time when the company faced liquidity issues necessitating the use of a factor, should have raised red flags,” and that Yale’s failure to heed
 
 *159
 
 those red flags was evidence of its “reckless[ness].” (App. at 94.) Reasonable commercial standards of fair dealing doubtlessly require a lien searcher to “examine the results of a proper search with reasonable diligence,”
 
 Summit Staffing,
 
 305 B.R. at 355, and a complete absence of secured debt may be an indication that the lien search was improperly conducted. Yale argues, however, that the absence of secured debt may not be a “red flag” at all — noting that many companies that enter into factoring agreements do so because their credit rating is too low to take out traditional secured loans. While that might well be so, a wiser course may have been to have inquired about the absence of not only recently-acquired secured debt, but also past-acquired debt. The fact that Yale did not do so is, without more, insufficient support for the Bankruptcy Court’s conclusion that Yale failed to comport with reasonable commercial standards of fair dealing.
 
 [21]
 

 III. Conclusion
 

 For the foregoing reasons, we will affirm the District Court’s decision to the extent it affirms the Bankruptcy Court’s determination that Wawel did not waive its security interest in JTTT’s accounts receivable. We will, however, vacate and remand that part of the District Court’s decision that affirms the Bankruptcy Court’s holding that Yale did not act in good faith and therefore cannot be a holder in due course or a purchaser of instruments. Accordingly, the District Court is to remand this matter to the Bankruptcy Court to determine whether Yale qualifies as a holder in due course or a purchaser of instruments, and to resolve the good faith element of that analysis in accordance with this Opinion.
 

 [1]
 

 . Wawel also sought damages from Yale for tortious interference and conversion. The Bankruptcy Court found in favor of Yale on both claims, and Wawel neither challenged that decision in the District Court nor does so before us.
 

 [2]
 

 . The parties agree that New Jersey law applies. New Jersey has adopted the Revised Article 9 of Uniform Commercial Code for secured transactions,
 
 see
 
 N.J.S.A. § 12A:9-101,
 
 et seq;
 
 the U.C.C. is codified in New Jersey as N.J.S.A. § 12A, followed by the relevant U.C.C. section number.
 

 [3]
 

 . A UCC-1 statement setting forth Wawel’s security interests was filed with the New Jersey Department of the Treasury on May 24, 2002, and the Bergen County Clerk’s Office on June 12, 2002. The parties do not dispute that Wawel perfected its security interest.
 

 [4]
 

 . Perkal requested a list of JTTT's clients and performed a credit check. Perkal also reviewed Yale's two most recent monthly bank statements. Although the two largest payments made by JTTT during those months were to Wawel, Perkal testified that he did not see a repetitive deduction for a loan.
 

 [5]
 

 .The agreement stated that JTTT "grants [Yale] a continuing first priority interest in and to the Collateral,” (Dist. Ct. Docket No. 7-3 at 18), which it defined, in pertinent part, as "all accounts (including [any] accounts purchased by [Yale] ...).”
 
 {Id.
 
 at 14.) Yale filed a UCC-1 financing statement setting forth its secured interest on March 26, 2003.
 

 [6]
 

 . If JTTT's clients failed to pay within 90 days of the assignment, Yale charged an extra one percent fee every ten days. Furthermore, after 90 days, Yale could require JTTT to repurchase the accounts receivable. Yale did so on a number of occasions because JTTT’s state and municipal clients would only pay if their employees passed the CDL test, and a number of them did not.
 

 [7]
 

 . Upon receiving the wired amount from Yale, the FHLB would notify Wawel in four ways — by phone, by facsimile, by letter confirming the transfer, and by a daily update on wires received. Each facsimile clearly identified the originating party as ‘Yale Factors NJ LLC,” and so too did the official record that was mailed to the bank. Upon notification, Wawel transferred the wired amount into JTTT’s account. Yale wired money to JTTT on 199 occasions from November 2003 until the end of the factoring relationship; the transfers amounted to approximately one million dollars. Ranzinger testified that the wire transfer-related documents were ‘'clerical” in nature, and that he was " [absolutely not” aware that JTTT was receiving wired money from Yale. (App. at 174-75.) The Bankruptcy Court credited his testimony. Neither Ran-zinger nor the Bankruptcy Court discussed the phone notifications.
 

 [8]
 

 .Also in March 2006, prior to the expiration of the factoring agreement, Yale learned that JTTT had been collecting payments on its accounts receivable rather than directing those payments to Yale. Yale then brought an action on March 6, 2006 in the Superior Court of New Jersey alleging, inter alia, breach of contract. On March 8, 2006, the Superior Court ordered JTTT to show cause why Yale was not entitled to preliminary in-junctive relief, and temporarily restrained JTTT from transferring or otherwise disposing of assets up to $700,000 in value. Wawel subsequently intervened in the action, which was stayed when JTTT filed for Chapter 11 bankruptcy.
 

 [9]
 

 . The decision contained several credibility findings, among them that Ranzinger was “highly credible,’’ and that Oliver’s testimony carried "little, if any, weight.” (App. at 87, 88). While the Bankruptcy Court did not expressly address Perkal's credibility, it did find — contrary to Perkal's testimony — that Ranzinger was unaware of the factoring agreement until December 9, 2005.
 

 [10]
 

 . The parties have not challenged the Bankruptcy Court's assumption that JTTT’s accounts receivable were instruments for purposes of Article 9.
 
 See
 
 U.C.C. § 9-102(a)(47).
 

 [11]
 

 . The Bankruptcy Court did not reach the notice-related requirements for holder-in-due-course and purchaser-of-instruments status because it determined that Yale had not purchased the accounts receivable in good faith.
 

 [12]
 

 . The District Court found "that the findings of fact underlying the Bankruptcy Court's determination that Wawel did not consent to [JTTT’s] sale of its collateral to Yale free of Wawel’s security interest[] were not clearly erroneous,” and that Yale did not act in good faith because it "had a[n unmet] duty to search both [JTTT’s] correct corporate name, as well as the roots of that name, for financing statements covering the [d]ebtor’s accounts receivable.” (App. at 51, 61-62)
 

 [13]
 

 .New Jersey has adopted revised Article 9 of the U.C.C.,
 
 see
 
 N.J.S.A 12A:9-101,
 
 et sec.,
 
 and its decisions interpreting the U.C.C. are binding on us.
 
 See Adams v. Madison Realty & Devel.,
 
 853 F.2d 163, 166 (3d Cir.1988). Where, as here, such case law is lacking, we look to other courts’ interpretation of the same language.
 
 See id.
 

 [14]
 

 . Whether Wawel explicitly or implicitly waived its security interest in JTTT’s accounts receivable is a “factual [question], which must be evaluated under the clearly erroneous standard.”
 
 Neu Cheese Co. v. Fed. Deposit Ins. Co.,
 
 825 F.2d 1270, 1272 (8th Cir.1987);
 
 see In re Great W. Sugar Co.,
 
 902 F.2d 351, 355 (5th Cir.1990);
 
 J.I. Case Credit Corp.
 
 v.
 
 Crites,
 
 851 F.2d 309, 312 (10th Cir.1988);
 
 see also
 
 U.C.C. Permanent Editorial Board (PEB) Commentary No. 3 (1990) (Whether the secured party authorized the disposition of collateral “subject to” or "free and clear of” its security interest presents "a factual question”).
 

 [15]
 

 . Former U.C.C. § 9-306(2) was, at times, interpreted to state that a creditor who knew of but did not prevent the sale of its collateral had waived its security interest.
 
 See, e.g.,
 
 
 *155
 

 LifeWise Master Funding v. Telebank,
 
 374 F.3d 917, 923 (10th Cir.2004) ("It is well settled ... that under [U.C.C.] § 9-306(2), a lien-holder who authorizes the sale of property in which he has a security interest waives the lien on the collateral ... [and] courts have even terminated security interests simply by implying authorization from a party’s conduct”) (citations omitted);
 
 Neu Cheese,
 
 825 F.2d at 1273 (where bank failed to object to debtor's repeated sales of collateral its “conduct warranted] an inference of the relinquishment of the bank’s right in the collateral”). That interpretation was not unanimous. In
 
 J.I. Case Credit Corp.,
 
 for example, the Tenth Circuit (interpreting Oklahoma law) held that, even assuming a creditor knew of the sale of its collateral, it did not waive its security interest where there was no suggestion in the record that the creditor
 
 “intended
 
 to ratify the prior sale and free the [collateral] from its security interest.” 851 F.2d at 313 (emphasis in original).
 

 The question of whether a creditor's tacit approval of the sale of collateral was enough to waive that creditor’s security interest was also addressed by the American Law Institute's Permanent Editorial Board ("PEB”) for the U.C.C. in 1990.
 
 See
 
 U.C.C. P.E.B. Commentary No. 3 (1990). The PEB analyzed whether there was a "conflict between [former] U.C.C. § 9-306(2), which terminated] a security interest upon any disposition of collateral that ha[d] been authorized by the secured party, and ... [former] U.C.C. § 9-402(7), which continued] the effectiveness of a financing statement with respect to collateral that ha[d] been transferred even though the secured party kn[ew] of and consent[ed] to the transfer[.]”
 
 Id.
 
 The PEB found no conflict because the “intent underlying [§ 9-306(2) was] to permit a disposition of the collateral free and clear of the security interest when the secured party has authorized the disposition free and clear of its security interest....”
 
 Id.
 
 The PEB continued: § 9-306(2), which set forth an "exception to the rule of survivability,” applied only if the secured party specifically "authorized the disposition, by agreement or otherwise,
 
 free and clear of the security interest." Id.
 
 (emphasis in original). The PEB Commentary was expressly adopted by revised U.C.C. § 9-315(a)(1).
 
 See
 
 U.C.C. § 9-315 cmt. 2.
 

 [16]
 

 . While there are several differences between holders in due course and purchasers of instruments, only one is relevant here. Specifically, to be a holder in due course, Yale must have taken without knowledge that Wawel had a security interest in the accounts receivable.
 
 See
 
 U.C.C. § 3-302(a)(2)(v). Alternatively, "a purchaser who takes even with knowledge of the security interest qualifies for priority under [U.C.C. § 9 — 330(d)] if it takes without knowledge that the purchase violates the rights of the holder of the security interest.”
 
 See id.
 
 at § 9-330 cmt. 7.
 

 [17]
 

 . We refer to the definition of “good faith”— and the corresponding commentary — set forth in Article 3 of the U.C.C. because the provisions of Article 9 regarding holders in due course refer to Article 3.
 
 See
 
 U.C.C. § 9-102(b) (stating that the definition of “[h] older in due course” in U.C.C. § 3-302 applies to Article 9);
 
 id.
 
 at § 9-331 cmt. 5 ("[I]n order to qualify as a holder in due course, the junior [secured party] must satisfy the requirements of Section 3-302, which include taking in 'good faith.' ”).
 

 Section 3-302 provides, in relevant part, that a holder in due course must take an instrument in "good faith.” U.C.C. § 3-302(a)(2)(ii). Section 3-103 defines terms used in Article 3, and — like Section 9-102(a)(43) — it defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing.”
 
 See
 
 U.C.C. §§ 3-103(a)(4) and 9-102(a)(43). The commentary to Section 3-103 (a) guides our analysis of whether Yale acted in good faith.
 

 [18]
 

 . Wawel focuses on the timing of the first search in the record, which is May 8, 2003, weeks after Yale and JTTT entered into their factoring agreement on March 20, 2003. While Perkal, Yale's president, testified that at least one search was conducted before the factoring agreement was executed, he could not produce documentation of that search, nor did he introduce billing records to establish that Yale had paid for it.
 

 Ultimately, however, the precise timing is irrelevant. The factoring agreement provided the framework under which Yale purchased JTTT's accounts receivable, which it did each time JTTT received a new account. (See,
 
 e.g.,
 
 Dist. Ct. Docket No. 7-3 at 28 (JTTT assigning its accounts to Yale while "representing] that it [was] the sole owner, free and clear of all liens, claims, security interests and encumbrances except in [Yale’s] favor”).) The lien search conducted on May 8, 2003 was before Yale purchased any of the accounts receivable at issue in this case. Thus, even were we to assume the May 8, 2003 search was the first search conducted, there is no question that Yale "undertook] a search to determine the existence of prior security interests” before "collecting the [relevant] accounts” of JTTT. See U.C.C. § 9-331 cmt. 5.
 

 [19]
 

 . We note that the New Jersey Department of Treasury UCC Search Manual Rule 1(G),
 
 available at
 
 http://www.state.nj.us/treasury/ revenue/dcr/geninfo/uccsrch.html (last visited July 13, 2009), instructs UCC-1 searchers to exclude "noise words,” including "Inc.” from their search terms.
 

 [20]
 

 . We note, however, that the Bankruptcy Court’s finding that Yale acted in good faith is unchallenged and may not be relitigated.
 

 [21]
 

 . The Bankruptcy Court expressly did not address whether Yale purchased JTTT's accounts receivable without notice of Wawel's security interest. (App. at 94-95 n. 7.) If the Bankruptcy Court were to conclude on remand that Yale had notice, it could not be a holder in due course. U.C.C. § 3-302(a)(2)(v); see
 
 id.
 
 at § 9-330 cmt. 7 (“notice of a conflicting security interest precludes a purchaser from becoming a holder in due course”). Should the Bankruptcy Court reach that conclusion, Yale nevertheless could be a U.C.C. § 9-330(d) purchaser of instruments provided that it bought the accounts receivable without the knowledge that its purchase violated the terms of the security agreement between Wawel and JTTT.
 
 See id.
 
 at § 9-330(d) cmt. 7. We leave both fact-based determinations to the Bankruptcy Court.