16 A.3d 1097 (2011)
419 N.J. Super. 279
PASCACK COMMUNITY BANK, Plaintiff-Respondent,
v.
UNIVERSAL FUNDING, LLP, Defendant-Appellant.
Universal Funding, LLP, Third-Party Plaintiff,
v.
Anthony E. Nestico, Third-Party Defendant.
No. A-2501-09T3.
Superior Court of New Jersey, Appellate Division.
Argued October 26, 2010.
Decided March 17, 2011.
*1099 Raphael G. Jacobs, Tenafly, argued the cause for appellant (Jacobs and Bell, PA, attorneys; Mr. Jacobs, on the brief).
George M. Pangis argued the cause for respondent (Stern, Lavinthal, Frankenberg & Norgaard, LLC, attorneys; Mr. Pangis, on the brief).
Before Judges SKILLMAN, YANNOTTI and ESPINOSA.
The opinion of the court was delivered by
ESPINOSA, J.A.D.
This action presents the competing interests of two secured creditors in the accounts receivable of a debtor. Defendant Universal Funding LLP (Universal) is a factoring company that purchased accounts receivable from D'Lusso Transport Services, Inc. (D'Lusso). Plaintiff Pascack Community Bank (Pascack) issued a line of credit (LOC) to D'Lusso that was secured, in part, by D'Lusso's accounts receivable. After D'Lusso defaulted, Pascack sought judgment against Universal for the amount due and owing to it under the terms of the LOC, claiming that Universal collected proceeds of accounts after Pascack had perfected its security interest. Universal appeals from the order granting summary judgment to Pascack and entering judgment against Universal for $144,569.71. For the reasons that follow, we reverse.
The record here is sparse, consisting of the certifications of Dominic L. Jengo, Universal's principal, and George M. Pangis, Esq., counsel for Pascack,[1] that were submitted to the court in support of a motion and cross-motion for summary judgment. In addition, the court was provided with a copy of the factoring agreement *1100 and two pages from the security agreement between Pascack and D'Lusso.
D'Lusso was a corporation incorporated in Delaware and located in New Jersey. Universal is a partnership engaged in the business of providing factoring services to other businesses by purchasing their accounts receivable for the face amount of the invoices less its fee. The factoring agreement, dated April 9, 2001, provided:
for and in consideration of a factoring fee of two and one half percent (.025%) for a period of 30 days from date accepted by Universal Funding LLP, and two and one half percent (.025%) for every 30 days thereafter not to exceed 60 days,
To be paid and satisfied as hereinafter mentioned, agrees to advance funds to D'LUSSO TRANSPORT SERVICES INC. under the following conditions:
1. UNIVERSAL FUNDING LLP will, within one working day after receipt of D'LUSSO TRANSPORT SERVICES INC. invoices to their clients, advance monies equal to 85% of the invoices presented for factoring.
2. UNIVERSAL FUNDING LLP will bear the responsibility of posting all invoices presented for factoring to the party as noted on the invoice. All original invoices must be presented to UNIVERSAL FUNDING LLP in duplicate with supporting documentation as may be required by the payer of the invoices.
3. In addition, a letter from D'LUSSO TRANSPORT SERVICES INC. will be supplied to UNIVERSAL FUNDING LLP on D'LUSSO TRANSPORT SERVICES INC., letterhead indicating that the invoices have been sold to UNIVERSAL FUNDING LLP. UNIVERSAL FUNDING LLP will then note the invoices as follows:
THIS INVOICE HAS BEEN SOLD
 AND
ASSIGNED TO UNIVERSAL FUNDING
 LLP.
 PAY TO AND ONLY TO
 UNIVERSAL FUNDING LLP
A/C OF D'LUSSO TRANSPORT SERVICES
 INC.
 P.O. BOX 740
 MAYWOOD, NJ XXXXX-XXXX
 XXX-XXX-XXXX
4. UNIVERSAL FUNDING LLP will forward the second payment for the balance of the factored invoices, less the factor fee, 60 days after the start of the program, and thereafter the second payment will be on a 30-day schedule.
. . .
7. If, after a period of the agreed upon factoring time, D'LUSSO TRANSPORT SERVICES INC., invoice payment has not yet been received, UNIVERSAL FUNDING LLP will charge-back to D'LUSSO TRANSPORT SERVICES INC., the monies advanced on those invoice(s) including the factor fee or upon request from D'LUSSO TRANSPORT SERVICES INC., will re-factor the unpaid invoices for an additional fee and time period originally agreed to.
8. Under this agreement, D'LUSSO TRANSPORT SERVICES INC. relinquishes all claims to monies represented by the factored invoices until such time as the invoices have been charged-back to them.
. . . .
Universal did not file any financing statements or ever conduct any inquiries to determine whether any other creditors asserted a lien on the accounts receivable.
According to the Pangis certification, Pascack established an LOC for D'Lusso on or about March 21, 2007. Pursuant to *1101 their security agreement,[2] D'Lusso granted Pascack a security interest "in all of the Property described below that I own or have sufficient rights in which to transfer an interest now or in the future, wherever the Property is or will be located, and all proceeds and products of the Property." The agreement stated that it granted a "[f]irst security interest in all business assets of D'Lusso Transport, Inc., UCC-1 filing." Among the various categories of property identified was "general intangibles," which specifically included payment intangibles.
The agreement also included the following warranties and representations by D'Lusso, which memorialized the fact that the corporation was authorized to continue to collect accounts receivable:
If this agreement includes accounts, I will not settle any account for less than its full value without your written permission. I will collect all accounts until you tell me otherwise. I will keep the proceeds from all the accounts and any goods which are returned to me or which I take back in trust for you. I will not mix them with any other property of mine. I will deliver them to you at your request. If you ask me to pay you the full price on any returned items or items retaken by myself, I will do so. You may exercise my rights with respect to obligations of any account debtors, or other persons obligated on the Property, to pay or perform, and you may enforce any security interest that secures such obligations.
[(Emphasis added.)]
Prior to issuing the LOC, Pascack conducted due diligence by way of a routine search of the filing systems in New Jersey. The search failed to reveal that D'Lusso was not incorporated in New Jersey and disclosed no other liens on any of D'Lusso's assets. Pascack filed a UCC-1 financing statement in New Jersey on March 29, 2007. The filing listed all of D'Lusso's assets, including accounts receivable.
After learning that D'Lusso was actually incorporated in Delaware, Pascack filed a second UCC-1 financing statement in Delaware on February 25, 2008. A UCC search conducted at that time again revealed that no other creditor had asserted a lien on D'Lusso's assets, including accounts receivable.
In April 2008, D'Lusso defaulted on the repayment of its LOC. According to the Pangis certification, Pascack learned for the first time thereafter that D'Lusso had entered into the factoring agreement with Universal. By letter in May 2008, Pascack advised Universal that it had a first priority position and supplied copies of its UCC-1 financing statements. Universal was also advised that any future payment due to be paid to D'Lusso as a result of the factoring agreement should instead be directed to Pascack. Jengo certified that Universal had no actual knowledge of any LOC arrangement made between Pascack and D'Lusso until receiving the May 2008 letter from Pascack's attorney. There is no evidence as to whether Universal collected any accounts receivable after receiving this notice.
According to the Pangis certification, Universal factored over $4.1 million worth of accounts receivable for D'Lusso after Pascack had issued the LOC to D'Lusso and perfected its security interest. However, Pascack presented no documents to support this assertion and did not identify *1102 the date when the security interest was purportedly perfected.
In its complaint, Pascack alleged the amount due and owing to it under the terms of the LOC loan made to D'Lusso was $144,569.71 and sought judgment against Universal for that amount. Universal filed a third-party complaint against D'Lusso. A default judgment was entered after D'Lusso failed to answer or otherwise defend.
Universal filed a motion for summary judgment and Pascack filed a cross-motion for summary judgment. The trial court denied Universal's motion and granted Pascack's motion, entering judgment against Universal for $144,569.71.
In this appeal, Universal argues that it acquired the accounts in good faith, without actual notice of Pascack's lien; that Pascack's lien does not have priority over its rights; and that the trial court erred in finding Universal did not act in good faith.
In reviewing an order granting summary judgment, this court employs the same standard of review as the trial court. Coyne v. N.J. Dep't of Transp., 182 N.J. 481, 491, 867 A.2d 1159 (2005); Burnett v. Gloucester County Bd. of Chosen Freeholders, 409 N.J.Super. 219, 228, 976 A.2d 444 (App.Div.2009). Summary judgment is warranted if the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); see also Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540, 666 A.2d 146 (1995). First, we determine whether the moving party has demonstrated that there are no genuine disputes as to material facts, and then we decide whether the motion judge's application of the law was correct. Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J.Super. 224, 230-31, 903 A.2d 513 (App. Div.), certif. denied, 189 N.J. 104, 912 A.2d 1264 (2006). We review issues of law de novo and accord no deference to the motion judge's conclusions on issues of law. Zabilowicz v. Kelsey, 200 N.J. 507, 512-13, 984 A.2d 872 (2009).
Guided by these principles and our review of the record, briefs, and arguments of counsel, we conclude that there was an absence of competent evidence to warrant the entry of judgment in favor of Pascack.

I
An essential factual premise for Pascack's summary judgment motion was that Universal collected proceeds of accounts after Pascack perfected its security interest. The trial court found "that many of the accounts receivable were assigned to Universal subsequent to Pascack's UCC[-]1 filing." However, there was no competent evidence in the record to establish this fact.
Under Article 9 of the Uniform Commercial Code (UCC), perfection of a security interest in the accounts of a registered organization, i.e., a corporation, must be filed in the state where it is incorporated. N.J.S.A. 12A:9-301(1), 9-307(e); see also Donald J. Rapson, "Receivables" Financing Under Revised Article 9, 73 Am. Bankr.L.J. 133, 147-48 (1999). Therefore, Pascack's interest in D'Lusso's accounts receivable was not perfected until the second UCC-1 financing statement was filed in Delaware in February 2008, just two months before D'Lusso defaulted. It follows that, for Pascack to be granted summary judgment, the competent evidence would have to establish that Universal collected $144,569.71 after the February 2008 UCC-1 financing statement was filed. However, the only support provided for *1103 this proposition is the following conclusory statement in the Pangis certification:
Further inquiry into the factoring agreement led Pascack to discover that during the period of time in which Pascack had issued the LOC to D'Lusso and perfected its security interest to the time when D'Lusso had ceased all operations, Universal had factored over $4.1 million dollars worth of accounts receivable for D'Lusso.
This certification, made by Pascack's counsel in support of the cross-motion for summary judgment, failed to provide any evidence cognizable in this summary judgment motion.
Rule 1:6-6 permits consideration of facts contained in "affidavits made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify and which may have annexed thereto certified copies of all papers or parts thereof referred to therein." The certification here did not represent that counsel had any personal knowledge of any of the facts asserted therein, provided no basis for a conclusion that he was competent to testify as to any of those factual assertions, and neither referred to nor attached any documents to support those assertions. Moreover, the certification failed to include the verification required for certifications in lieu of oath, "I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment." See R. 1:4-4(b). Therefore, the certification had no evidentiary value.
Even if the Pangis certification could be considered, the statement that Universal factored over $4 million worth of accounts receivable for D'Lusso during the time in which Pascack issued an LOC is far too general to be illuminating, and indeed, is sufficiently ambiguous as to be misleading in determining these facts. The time period in which the LOC was issued encompasses the period from March 2007 and includes a substantial period of time in which Pascack's interest was unperfected. Moreover, that ill-defined period may include prior loans on LOCs to D'Lusso that were paid in full.[3] The record also fails to provide any information as to the status of the accounts as of the date that Pascack perfected its interest, what proceeds were collected from accounts factored before and after that date, or what proceeds, if any, were collected from accounts after Universal received the May 2008 letter. In addition, it is unclear whether "factored" refers to the amount of the receivables purchased by Universal or to the amounts Universal collected on such receivables.
In short, the submission made by Pascack in support of its cross-motion for summary judgment was wholly insufficient to warrant a grant of summary judgment in its favor.

II
There are additional questions of fact that preclude summary judgment in favor of Pascack.
Accounts receivable fall within the definition of "payment intangible," i.e., "a general intangible under which the account debtor's principal obligation is a monetary obligation," N.J.S.A. 12A:9-102(a)(61), and, therefore, lie within the scope of Chapter 9 of the UCC. See N.J.S.A. 12A:9-109(a)(3). The sale of a payment intangible includes both the sale of a right in the receivable *1104 and the sale of an enforcement right. Comment 5 to N.J.S.A. 12A:9-109. The "principal effect" of including both types of transactions within Article 9 "is to apply this Article's perfection and priority rules to these sales transactions." Ibid. The facts here raise substantial questions as to how those perfection and priority rules apply to Pascack's and Universal's interests. We discuss two of those questions: whether Universal's factoring transactions were true "sales" that resulted in automatic perfection pursuant to N.J.S.A. 12A:9-309(3) and (4), and whether Universal was a holder in due course.[4]

A.
As a buyer of receivables, Universal is a "secured party" under Article 9. See Comment 5 to N.J.S.A. 12A:9-109. The sale of a payment intangible is granted automatic perfection upon "attachment," i.e., when the security interest becomes enforceable against the debtor. N.J.S.A. 12A:9-309(3) and (4); see James J. White and Robert S. Summers, Uniform Commercial Code, § 31-7 at 162 (6th ed.2010); James J. White and Robert S. Summers, Uniform Commercial Code, § 21-1 at 34 (4th ed.2000). Although there was attachment of Universal's interest against D'Lusso, a question exists as to whether there was a true sale of the accounts receivable.
As the Official Comment notes, the distinction "between transactions in which a receivable secures an obligation and those in which the receivable has been sold outright" is often "blurred." Comment 4 to N.J.S.A. 12A:9-109. Although Article 9 "occasionally distinguishes between outright sales of receivables and sales that secure an obligation," the Comment notes that "neither this Article nor the definition of `security interest' (Section 1-201(37)) delineates how a particular transaction is to be classified. That issue is left to the courts." Ibid.
The factoring agreement required D'Lusso to supply a letter on its letterhead "indicating that the invoices have been sold to [Universal.]" (Emphasis added). However, Universal agreed to "advance monies equal to 85% of the invoices presented for factoring[,]" and, if the invoice payment was not timely received, it was agreed that Universal would "charge-back to [D'Lusso] the monies advanced on those invoice(s)[.]" (Emphasis added). It is, therefore, unclear from the language of the factoring agreement whether and to what extent the risk of non-payment was transferred to Universal or retained by D'Lusso. To the extent that the credit risk was not transferred, the transaction may constitute a loan which, unlike a true sale, would not enjoy automatic perfection. See In re Qualia Clinical Serv., 441 B.R. 325 (8th Cir. BAP 2011); In re De-Pen Line, Inc., 215 B.R. 947 (Bankr.E.D.Pa. 1997); see also White & Summers, 6th ed., supra, § 31-7 at 163-64. The question whether the factoring transactions were true sales of payment intangibles was not addressed in the summary judgment motion and the record is insufficient to permit a determination by this court.

B.
As previously noted, Universal never filed a financing statement. If its interest was not perfected pursuant to the automatic perfection provision, Pascack *1105 "can reach the sold receivable and achieve priority over (or take free of) the buyer's unperfected security interest under section 9-317." Comment 5 to N.J.S.A. 12A:9-109; see also N.J.S.A. 12A:9-317, 9-318(b), and 9-322. However, if Universal qualifies as a holder in due course, Pascack may not prevail. Comment 5 to N.J.S.A. 12A:9-331, the section which establishes the priority of "rights of purchasers of instruments, documents, and securities under other chapters[,]" notes:
Under this section, a secured party with a junior security interest in receivables (accounts, chattel paper, promissory notes, or payment intangibles) may collect and retain the proceeds of those receivables free of the claim of a senior secured party to the same receivables, if the junior secured party is a holder in due course of the proceeds.
"A holder in due course is `one who takes an instrument for value, in good faith, and without notice of dishonor or any defense against or claim to it on the part of any person'." Triffin v. Pomerantz Staffing Servs., LLC, 370 N.J.Super. 301, 307, 851 A.2d 100 (2004) (quoting Triffin v. Quality Urban Hous. Partners, 352 N.J.Super. 538, 541, 800 A.2d 905 (App.Div.2002)); see also N.J.S.A. 12A:9-102(b) and 3-302(a). There appearing to be no question that Universal took the accounts receivable for value and without notice of Pascack's claim, the focus of the trial court's inquiry was good faith.
The court concluded that Universal could not be a holder in due course because it did not act in good faith.[5]
In order to qualify as a holder in due course, the junior [secured party] must satisfy the requirements of Section 3-302, which include taking in "good faith." This means that the junior not only must act "honestly" but also must observe "reasonable commercial standards of fair dealing" under the particular circumstances. See section 9-102(a).
[Comment 5 to N.J.S.A. 12A:9-331.]
The trial court assumed that Universal's failure to conduct any inquiries defeated any claim of good faith. However, the reasonable commercial standards under the particular circumstances may or may not require the junior secured party to conduct a search of the records in filing offices. Ibid. The question is a fact-sensitive issue that is decided on a case-by-case basis. Ibid.
It is undisputed that Universal lacked any knowledge of Pascack's security interest until May 2008, after D'Lusso defaulted. While this may satisfy the subjective prong of the "good faith" test, Universal must also satisfy the objective prong-that it observed accepted "reasonable commercial standards of fair dealing." Ibid.; In re Jersey Tractor Trailer Training, Inc. (In re JTTT), 580 F.3d 147, 156 (3d Cir.2009); see also Comment 20 to N.J.S.A. 12A:1-203. The Third Circuit adopted the following two-part test for evaluating the second prong:
First, whether the conduct ... comported with industry or `commercial' standards applicable to the transactions and, second, whether those standards were reasonable standards intended to result in fair dealing.
[In re JTTT, supra, 580 F.3d at 157.]
In concluding that Universal failed to act in good faith, the trial court stated that "given the business of Universal, it either *1106 knew or should have known, that [D'Lusso] had creditors for which a simple search could have provided a complete notice of Pascack's lien." The court stated further:
Universal could have quickly and easily determined that the collecting ... [of D'Lusso's] accounts receivable infringed on property rights of Pascack's senior secured interest. Even if Universal had been factoring [D'Lusso] for more than six years prior to Pascack's lien, Universal should have conducted an occasional search for any other creditors.
Universal chose to make themselves willfully blind to the existence of superior liens by undertaking no investigation at all and took no reasonable steps to secure their arrangement. As a result, this Court finds Universal violated the standard of good faith.
Much of the court's conclusion hangs upon factual premises that are unsupported by the record.
Certainly, Universal's failure to conduct any lien searches is a significant factor in determining whether it acted in good faith,[6] but this fact is not dispositive. Turning to the test adopted in In re JTTT, there is nothing in the record to indicate what industry or commercial standards were applicable to the transactions here, let alone "whether those standards were reasonable standards intended to result in fair dealing." Id. at 157.
Also significant to a determination of what constituted commercially reasonable standards here is the fact that Pascack's security agreement permitted D'Lusso to continue to collect accounts receivable until such time as Pascack notified D'Lusso to cease doing so. In assessing the demands of reasonable commercial standards in various circumstances, Comment 5 to N.J.S.A. 12A:9-331 addressed this very scenario:
[I]f there was a course of performance between the senior secured party and the debtor which placed no such restrictions on the debtor and allowed the debtor to collect and use the proceeds without any restrictions, the junior secured party may then satisfy the requirements for being a holder in due course. This would be more likely in those circumstances where the junior secured party was providing additional financing to the debtor on an on-going basis by lending against or buying the accounts and had no notice of any restrictions against doing so. Generally, the senior secured party would not be prejudiced because the practical effect of such payment to the junior secured party is little different than if the debtor itself had made the collections and subsequently paid the secured party from the debtor's general funds. Absent collusion, the junior secured party would take the funds free of the senior security interests.
See also Rapson, supra, 73 Am. Bankr. L.J. at 149-50.
The facts articulated in this hypothetical are all present in this case. Universal was providing factoring services to D'Lusso for six years before D'Lusso's security agreement with Pascack and for an additional year after that before Pascack perfected its security interest by filing a UCC-1 financing statement in Delaware. It is undisputed that Universal lacked knowledge of that agreement before May 2008, and only learned of the security agreement after D'Lusso defaulted. There is no evidence in the record that Pascack ever placed any restrictions on D'Lusso's *1107 right to collect its receivables. There is no evidence in the record of any collusion between Universal and D'Lusso. The determination as to what commercially reasonable standards applied here required consideration of these facts before any conclusion could be drawn as to whether the failure to conduct any searches precluded a finding of good faith and holder in due course status for Universal.
The record also fails to support the court's conclusion that "a simple search" would have revealed the existence of a superior lien by Pascack. Citing UCC § 9-506(c), the Third Circuit held in In re JTTT that "a commercially reasonable lien search is a `search of the records of the [relevant state or county] filing office, under the debtor's correct name, using the filing office's standard search logic....'" 580 F.3d at 158. Because Pascack did not file a UCC-1 financing statement in the "relevant" state until February 2008, it is merely speculative that a commercially reasonable lien search would have revealed Pascack's lien prior to that date.
In summary, the record was plainly insufficient to warrant summary judgment in plaintiff's favor and questions of fact existed that precluded the entry of summary judgment.
Reversed.
NOTES
[1] As discussed in greater detail later in this opinion, the Pangis certification did not comply with the personal knowledge requirement of Rule 1:6-6 or the verification requirement of Rule 1:4-4(b).
[2] Neither a copy of the complete security agreement nor any other document referred to in the certification was attached to the certification as an exhibit. However, two pages of the security agreement were provided to the court.
[3] The trial court noted that, at oral argument on the motions, it was learned that Pascack made several prior loans on LOCs to D'Lusso, all of which were paid.
[4] Because there is no evidence regarding the checks received by Universal in its collection of the receivables, the record does not permit an evaluation of whether such proceeds may qualify as instruments, making Universal a purchaser of instruments entitled to priority under N.J.S.A. 12A:9-330(d).
[5] The court also rejected Universal's argument that it was a holder in due course because it found that accounts receivable are not negotiable instruments. Although we agree that the accounts receivable are not negotiable instruments, that fact does not end the inquiry.
[6] In contrast to Universal's inaction, in In re JTTT, where it was undisputed that inquiry was required by the circumstances, the factoring company enlisted Dun & Bradstreet to conduct monthly lien searches. 580 F.3d at 150, 156.